1  Daniel A. Solitro (SBN 243908)
   dsolitro@lockelord.com
2  LOCKE LORD LLP
3  300 South Grand Avenue, Suite 2600
   Los Angeles, CA  90071
4  Tel: (213) 485-1500
   Fax: (213) 485-1200
5
6  Bryan G. Harrison (*admitted pro hac vice*)
   bryan.harrison@lockelord.com
7  Michael Wolak III (*admitted pro hac vice*)
   michael.wolak@lockelord.com
8  LOCKE LORD LLP
   Terminus 200, Suite 1200
9  3333 Piedmont Rd NE
   Atlanta, GA 30305
10 Tel: (404) 870-4629
   Fax: (404) 806-5622
11
12 Attorneys for Plaintiff
   Jiaxing Super Lighting Electric Appliance Co., Ltd.
13
14              **UNITED STATES DISTRICT COURT**
15             **NORTHERN DISTRICT OF CALIFORNIA**
16                **SAN FRANCISCO DIVISION**
17 JIAXING SUPER LIGHTING ELECTRIC      )  Case No. 3:21-cv-08489-MMC
   APPLIANCE CO., LTD., individually, and )
18 derivatively on behalf of Lunera Lighting, Inc., )  **FIRST AMENDED VERIFIED**
19                                        )  **COMPLAINT FOR:**
                 Plaintiff,               )
20                                        )  **(1) FRAUDULENT TRANSFER OF**
        vs.                               )      **ASSETS**
21                                        )
22 JOHN BRUGGEMAN, STEVE WESTLY,         )  **(2) DERIVATIVE CREDITOR CLAIM**
   FRANK CREER, DAVE COGLIZER, SUSAN     )      **FOR BREACH OF FIDUCIARY**
23 MCARTHUR, ALAN GREENBERG,             )      **DUTIES**
   RICHARD ROCK, TYNAX, INC., SIGNIFY    )
24 HOLDING B.V., ADVANCED TRADING        )
   LLC, OEO ENERGY SOLUTIONS, LLC,       )  **(3) ALTER EGO/CORPORATE VEIL**
25 JOHN EINARSEN, LAWRENCE BUTZ, and     )      **PIERCING**
   LUNERA LIGHTING, INC.,                )
26                                        )  **JURY TRIAL DEMANDED**
27               Defendants.              )
                                          )
28 _____)

*(left margin, vertical text)* **Locke Lord LLP** 300 South Grand Avenue, Suite 2600 Los Angeles, CA  90071

Plaintiff Jiaxing Super Lighting Electric Appliance Co., Ltd. ("Super Lighting"), by and through its undersigned counsel, files this First Amended Verified Complaint ("Complaint") against defendants Tynax, Inc. ("Tynax"), Signify Holding B.V. ("Signify"), Advanced Trading, LLC ("Advanced Trading"), OEO Energy Solutions, LLC ("OEO") (collectively, the "Corporate Defendants"); nominal defendant Lunera Lighting, Inc. ("Lunera"); John Einarsen and Lawrence Butz (the "Individual Defendants"); and former Lunera board of director members John Bruggeman, Steve Westly, Frank Creer, Susan McArthur, Richard Rock, Dave Coglizer, and Alan Greenberg (the "Director Defendants") (collectively with Lunera, the Corporate Defendants, and the Individual Defendants, the "Defendants"); and derivatively as judgment creditor on behalf of nominal defendant Lunera, and alleges as follows:

## I.      SUMMARY OF THE ACTION

1.      This case involves a deliberate plan by Lunera's former directors—knowing they had expanded fiduciary duties to Lunera due to its insolvency—to cause Lunera to fraudulently transfer substantially all of Lunera's assets.  The Director Defendants also breached their expanded fiduciary duties to Lunera by deliberately acting with a purpose other than advancing the best interests of Lunera and closing a value maximizing transaction.

2.      Rather than fulfil their duties of good faith, care and loyalty to Lunera toward a $6.9 million deal to maximize the value of Lunera for the benefit of all its residual claimants (a category that included creditors such as Super Lighting due to Lunera's insolvency), the Director Defendants placed their own self-interests above Lunera's and instead caused Lunera to fraudulently transfer its remaining assets in a fire sale for grossly inadequate consideration and for the intended and admitted purpose of putting those assets beyond Super Lighting's reach to impede its ability to enforce its arbitration award against Lunera.

3.      Accordingly, Super Lighting seeks to enforce its $14.4 million Judgment against Lunera's former directors and the recipients of Lunera's assets, all of whom were complicit in and aided and abetted the fraudulent transfers.  Super Lighting also seeks, in its derivative capacity on behalf of Lunera, damages in favor of Lunera on the breach of fiduciary duty claims.

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

## II.      THE PARTIES

### A.      Plaintiff Super Lighting

4.      Plaintiff SUPER LIGHTING is a lighting manufacturer organized in China with its principal office located at No. 1288, Jiachuang Road, Xiuzhou Area, Jiaxing City, Zhejiang Province, China.   Super Lighting specializes in researching, designing, manufacturing, and marketing lighting solutions.

### B.      Nominal Party Lunera

5.      Nominal party LUNERA was a non-public Delaware corporation headquartered in Santa Clara County, California.   Lunera was a distributor of its own branded lighting products. Lunera purchased products from manufacturers such as Super Lighting, branded them, and resold them to retail lighting distributors.   Lunera shut down its business operations in December 2018 and officially dissolved on July 30, 2019.   Under Section 278 of the Delaware General Corporation Law, Lunera continues for a term of three years from such dissolution for the purpose of prosecuting and defending suits by or against it.   8 Del. C. § 278.   Lunera is named as a nominal party solely in a derivative capacity.

### C.      The Corporate Defendants

6.      Defendant TYNAX is a Delaware corporation with its principal place of business currently located in Nevada.   At all times relevant to the allegations of this Complaint, Tynax's principal place of business was located in this judicial district in Scotts Valley, California.   Tynax consents to process against it in any action upon any liability incurred within the State of California prior to December 18, 2020, and may be served with legal process through the California Secretary of State's Office with copies of all legal process to be forwarded to Tynax's designated mailing address for receipt of such process, located at 2850 West Horizon Ridge Parkway, Suite 200, Henderson, Nevada 89052.

7.      Defendant SIGNIFY is a Dutch corporation with its principal place of business located at High Tech Campus 48, 5656 AE, Eindhoven, the Netherlands.

8.      Defendant ADVANCED TRADING is a Delaware corporation with its principal office located at 143 E. Main Street, Lake Zurich, Illinois 66047.   Advanced Trading was organized

**Locke Lord LLP**
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

and incorporated on January 17, 2019.  Advanced Trading was at all relevant times formed, owned, operated, controlled, and dominated by the Individual Defendants, was and is the alter ego of the Individual Defendants and vice versa, was and is united in interest with the Individual Defendants, was and is subject to the Individual Defendants' effective direction and control, and was and is operated by the Individual Defendants as their alter ego.

9.     Defendant OEO is a Nevada corporation with its principal office located at 143 E. Main Street, Lake Zurich, Illinois 66047.  OEO was co-founded, and at all relevant times was and is owned and controlled, by the Individual Defendants.

**D.     The Individual Defendants**

10.     Defendant JOHN EINARSEN ("Einarsen") is an individual residing in Illinois.  At all relevant times, Einarsen was and still is a principal Manager with Corporate Defendants OEO and Advanced Trading, and CEO of OEO.  Upon information and belief, OEO was co-founded, and at all relevant times was and is owned and controlled, by Einarsen.  Upon information and belief, Advanced Trading was at all relevant times formed, owned, operated, controlled, and dominated by Einarsen, was and is the alter ego of Einarsen, and vice versa, was and is united in interest with Einarsen, was and is subject to Einarsen's direction and control, and was and is operated by Einarsen as his alter ego.

11.     Defendant LAWRENCE BUTZ ("Butz") is an individual residing in Illinois.  At all relevant times, Einarsen was and still is a principal Manager with Corporate Defendants OEO and Advanced Trading, and President of OEO.  Upon information and belief, OEO was co-founded, and at all relevant times was and is owned and controlled, by Butz.  Upon information and belief, Advanced Trading was at all relevant times formed, owned, operated, controlled, and dominated by Butz, was and is the alter ego of Butz, and vice versa, was and is united in interest with Butz, was and is subject to Butz's direction and control, and was and is operated by Butz as his alter ego.

**E.     The Director Defendants**

12.     The following persons were members of Lunera's board of directors at all times relevant to the allegations in this Complaint and who, at all relevant times, culpably participated, directly and indirectly, in the conduct and management of Lunera's business affairs, including the

approval and effectuating of the fraudulent transfers and other intentional misconduct complained of in this Complaint in breach of their fiduciary duties to Lunera and, derivatively, to its largest creditor, Super Lighting. At all relevant times, the Director Defendants had the power to control and influence and did control and influence and intentionally cause Lunera to engage in the practices and wrongdoing alleged in this Complaint:

13.     Defendant JOHN BRUGGEMAN ("Bruggeman") is an individual residing in California. In addition to serving on Lunera's board of directors, Bruggeman served as Lunera's CEO from April 2016 through February 10, 2019, and continued to consult to the Lunera board of directors following his resignation as CEO in connection with the proposed sale of Lunera's assets.

14.     Defendant STEVE WESTLY ("Westly") is an individual residing in California. In addition to serving on Lunera's board of directors, Westly is the founder and Managing Partner of the Westly Group in Menlo Park, California. The Westly Group was at all relevant times Lunera's largest shareholder. The Westly Group's portfolio of companies includes View, Inc., a company utilizing cloud-connected and managed, software-based window and building solutions.

15.     Defendant DAVE COGLIZER ("Coglizer") is an individual residing in California. In addition to serving on Lunera's board of directors, Coglizer is a Partner with the Westly Group.

16.     Defendant FRANK CREER ("Creer") is, upon information and belief, an individual residing in California. At all relevant times, Creer was a member of the Lunera board of directors.

17.     Defendant ALAN GREENBERG ("Greenberg") is, upon information and belief, an individual residing in Toronto, Ontario (Canada). At all relevant times, Greenberg was a member of the Lunera board of directors.

18.     Defendant SUSAN MCARTHUR ("McArthur") is, upon information and belief, an individual residing in Toronto, Ontario (Canada). At all relevant times, McArthur was a member of the Lunera board of directors.

19.     Defendant RICHARD ROCK ("Rock") is an individual residing in California. At all relevant times, Rock was a member of the Lunera board of directors.

FIRST AMENDED VERIFIED COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Locke Lord LLP**
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

## III.    JURISDICTION AND VENUE

20.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, exclusive of interest and costs, and the action is between citizens of different States (or a foreign state other than China) and a citizen of a foreign state (China), such that no defendant is the same citizenship as the plaintiff.

21.    This Court has personal jurisdiction over nominal party Lunera because it has at all relevant times purposefully availed itself of the privileges of conducting business in the State of California and in this judicial district, including at all times maintaining its principal place of business within this judicial district, as well as its status as a nominal party on whose behalf Super Lighting derivatively asserts creditor claims for breaches of fiduciary duties, and its conduct committed in this judicial district in making the fraudulent transfers complained of in this Complaint.

22.    This Court has personal jurisdiction over each of the Corporate Defendants because Super Lighting's claims arise out of each Corporate Defendant's conduct purposefully directed at this forum in transacting business directly or indirectly with Lunera in this judicial district in connection with the fraudulent transfers of assets alleged in this Complaint.  Each of the Corporate Defendants was transacting business directly or indirectly with Lunera in this judicial district as part of and to effectuate the fraudulent transfers and wrongful conduct alleged in this Complaint, including the Corporate Defendants' receipt of the fraudulently transferred assets.  Accordingly, each of the Corporate Defendants purposefully availed themselves of the privileges and benefits of conducting business directly or indirectly with Lunera in the State of California and in this judicial district in connection with the fraudulent transfers of assets alleged in this Complaint.  Each of the Corporate Defendants aided and abetted and colluded with the Director Defendants in facilitating and effectuating the fraudulent transfers and breaches of fiduciary duties alleged in this Complaint.

23.    This Court has jurisdiction over the Individual Defendants because each of them at all relevant times acted in their capacity as the principal Managers of Corporate Defendants OEO and Advanced Trading and as President and CEO of Corporate Defendant OEO.  Super Lighting's claims arise out of the Individual Defendants' actions purposefully directed at this forum on behalf

of Corporate Defendants OEO and Advanced Trading in transacting business with Lunera in this judicial district in connection with the fraudulent transfers of assets alleged in this Complaint, including their conduct in forming Corporate Defendant Advanced Trading as a shell company to further conceal the fraudulent transfers from Lunera to Corporate Defendant OEO. Each of the Individual Defendants, acting on behalf of Corporate Defendants OEO and Advanced Trading, was transacting business with Lunera in this judicial district as part of and to effectuate the fraudulent transfers and wrongful conduct alleged in this Complaint, including Corporate Defendants OEO's and Advanced Trading's receipt of the fraudulently transferred assets. Accordingly, each of the Individual Defendants purposefully availed themselves of the privileges and benefits of conducting business with Lunera in the State of California and in this judicial district in connection with the fraudulent transfers of assets alleged in this Complaint. Each of the Individual Defendants, acting on behalf of Corporate Defendants OEO and Advanced Trading, aided and abetted and colluded with the Director Defendants in facilitating and effectuating the fraudulent transfers and breaches of fiduciary duties alleged in this Complaint.

24. This Court has general jurisdiction over Director Defendants Bruggeman, Westly, Coglizer and Rock because they reside in California. This Court also has specific jurisdiction over each of the Director Defendants because Super Lighting's claims arise out of their status, actions, and conduct purposefully directed at this forum on behalf of Lunera in this judicial district at all relevant times, including their actions taken on behalf of Lunera in this judicial district in approving and causing Lunera to make the fraudulent transfers of assets in breach of their fiduciary duties to Lunera and, derivatively, to Super Lighting, as alleged in this Complaint. Each of the Director Defendants was acting on behalf of Lunera in this judicial district in their capacity as directors, including attending Lunera board meetings in person and/or telephonically in this judicial district at all relevant times (including the September 2018 and January 2019 board meetings discussed below), when they voted to approve the transfer of substantially all of Lunera's assets to the Corporate Defendants as alleged herein and in breach of their fiduciary duties owed to Lunera and, derivatively, to Super Lighting, and are therefore subject to personal liability in respect of such fraudulent transfers and breach of fiduciary duty. Super Lighting's claims arise out of the Director

Defendants' actions and conduct that were taken on behalf of Lunera in this judicial district and therefore purposefully directed and aimed at this forum.  Through their actions and conduct at all relevant times on behalf of Lunera as alleged herein, the Director Defendants purposefully availed themselves of this forum, including the benefits and privileges of conducting business on behalf of Lunera in this forum.  Each of the Director Defendants aided and abetted and colluded with the Corporate Defendants in facilitating and effectuating the fraudulent transfers and breaches of fiduciary duties alleged in this Complaint.

25.     Pursuant to 28 U.S.C. § 1391(b)(2) and (3), venue is appropriately placed in this judicial district because a substantial portion of the conduct giving rise to the claims occurred in this judicial district, including the Corporate Defendants' and Individual Defendants' transacting of business with Lunera in this judicial district in connection with the fraudulent transfers alleged herein, and each of the Director Defendants acted on behalf of Lunera in this judicial district in their capacity as directors when they approved and effectuated the fraudulent transfer of Lunera's assets to the Corporate Defendants in breach of their fiduciary duties owed to Lunera.  Additionally, at all relevant times, nominal party Lunera maintained its principal place of business in this judicial district, and all Defendants are subject to personal jurisdiction in this Court, as alleged above.

## IV.   DIVISIONAL ASSIGNMENT

26.     This case was reassigned to the San Francisco Division pursuant to General Order No. 44 on January 22, 2022. [ECF 39].

## V.   OPERATIVE FACTS

### A.   Lunera's Continued Breach of the Purchase Agreement Despite Super Lighting's Numerous Accommodations and Support to Lunera.

27.     In 2016, Super Lighting and Lunera entered into a Purchase and Development Agreement (the "Agreement") for Lunera's purchase of traditional LED lighting products from Super Lighting.  Super Lighting was at all relevant times Lunera's largest supplier of traditional LED lighting products.

28.     In late 2017, Lunera stopped paying Super Lighting's invoices for delivered products. Lunera acknowledged its breach of the Agreement and requested accommodation from Super

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

Lighting, including a revised payment schedule.  Super Lighting agreed to these accommodations, making every effort to support Lunera so that it could maintain normal business operations, but Lunera failed to comply with its own proposed terms or otherwise remedy its undisputed delinquencies.

29.    For example, by February 2018, Lunera owed Super Lighting more than $11 million in outstanding invoices for delivered goods.  The Director Defendants were well aware of Lunera's undisputed default and liability to Super Lighting.  In fact, as early as January 31, 2018, Lunera emailed Super Lighting and acknowledged its "unfortunate … delay[ ] in payment" and "failure on commitments" and represented that "getting current with Super Lighting is [its] absolute top priority."

30.    Lunera represented that the problem was temporary and that it expected to receive additional funding to pay the delinquent amounts.  In March 2018, Lunera proposed a payment plan for paying off the admittedly delinquent amounts, agreeing to pay $11.9 million towards the past-due invoices.  Lunera pleaded with Super Lighting to continue shipping new products while it was paying off the outstanding amounts and suggested that, without Super Lighting's commitment, Lunera would not be able to generate the revenues needed to pay off the debt.

31.    As discussed below, however, those revenues were not being used—and Lunera had no intention of using those revenues—to pay off Super Lighting; rather they were diverted to Lunera's smart-lighting division and not for the purpose of providing any value to Lunera's residual beneficiaries.

32.    Super Lighting agreed to the proposed payment plan and continued accepting new purchase orders from Lunera.  By the end of April 2018, however, Lunera had already defaulted on its own proposed payment plan and continued to plead with Super Lighting that Lunera would be "shut down" if Super Lighting did not continue to ship products and support Lunera.

33.    Over the next few months, Super Lighting continued to accommodate Lunera, but it was to no avail despite Lunera's representations that it would make weekly payments of $100,000.

34.    In July 2018, Super Lighting terminated the Agreement after Lunera failed to cure the delinquencies.

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

**B.     Lunera Willfully Diverts Revenues to Oro Networks Instead of Paying Super Lighting Pursuant to the Agreement.**

35.     Despite Super Lighting's accommodations and support of Lunera so that it could "generate the revenues needed to pay off the debt," Lunera was instead diverting the revenues from the sales of millions of dollars of goods purchased from Super Lighting to an entity formed by Lunera's former Chief Technology Officer ("CTO").

36.     Oro Networks LLC ("Oro Networks") was formed in January 2018 by Ajay Malik ("Malik"), Lunera's former CTO.   Oro Networks had the same business address as Lunera. Lunera's banking statements obtained by Super Lighting during post-judgment discovery show that Lunera transferred approximately $2.8 million to Oro Networks and more than $400,000 to Malik in 2018.

37.     Oro Networks was formed for the purpose of developing the source code and software for Lunera's smart-lighting, "internet-of-things" ("IoT") technology.   The IoT software could be integrated into traditional LED lamps to enable smart, cloud-based applications of lighting fixtures and devices.   Lunera referred to its IoT source code and software as its **"IoT Assets."** Director Defendant Bruggeman testified during post-judgment discovery that Lunera controlled "100%" of Oro Network's "decisions regarding product development, engineering, [and] expenditures" and that Malik needed Lunera's approval for any such decisions.

38.     The Director Defendants intentionally caused Lunera to breach the Agreement and its own proposed payment plan and wrongfully divert revenues from their sales of Super Lighting products to Oro Networks and Malik.   In fact, Lunera admitted to Super Lighting that it used those revenues to fund its smart-lamp technology instead of paying Super Lighting pursuant to the Agreement and as promised.   In a February 2018 email, Lunera represented to Super Lighting that "profits from [Lunera's] standard lamp business are reallocated to R&D for smart lamps," and that Lunera's business plan was "to further develop and focus on the smart lamp technology."

39.     Lunera made no representations to Super Lighting that the diversion of revenues to smart-lamp R&D was the best opportunity for Lunera to survive or to otherwise provide value to all residual beneficiaries, both stockholders *and creditors such as Super Lighting*.

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

C.     **Super Lighting Commences Litigation Against Lunera in August 2018.**

40.    Given Lunera's refusal to cure its breaches of the Agreement and its own proposed payment plans, Super Lighting commenced an action against Lunera on August 20, 2018 in the United States District Court for the Northern District of California, styled as *Jiaxing Super Lighting Electric Appliance Co., Ltd., et al. v. Lunera Lighting, Inc.*, Case No. 18-cv-05091 (the "Litigation") for breach of the Agreement.  Super Lighting sought $13,248,952 in damages due to Lunera's breach of the Agreement, plus attorneys' fees.

41.    The Director Defendants had knowledge of the Litigation upon its filing and caused Lunera to engage DLA Piper LLP ("DLA") as outside counsel to represent Lunera in the Litigation. Super Lighting and Lunera agreed to arbitration pursuant to the arbitration provision in the Agreement (the "Arbitration").

D.     **Lunera's Insolvency and the Director Defendants' Knowledge of their Expanded Fiduciary Duties to Lunera Due to Insolvency.**

42.    The Director Defendants knew as early as December 31, 2017 that Lunera was insolvent and that its ability to continue as a going concern was in jeopardy.  In fact, from at least December 31, 2017, and continuing through Lunera's dissolution in July 2019, the Director Defendants knew that Lunera was at all times insolvent because the sum of its debts remained significantly greater than the sum of the fair market value of its assets during that time period *and* it was not paying its debts as they became due, especially with respect to Super Lighting.

43.    For example, the audited financial statements of Lunera as of December 31, 2017 show that its total liabilities of $27 million were greater than its total assets of $21 million.  The Report of Independent Auditors (the "Report") containing those audited financial statements declared that "the Company has suffered recurring losses from operations that raises substantial doubt about its ability to continue as a going concern."  The Director Defendants knew that Lunera was insolvent as of December 31, 2017 because the Report was prepared for and provided to the Director Defendants.

44.    Additionally, in April 2018, Lunera, through Director Defendant Bruggeman, delivered a presentation to Super Lighting's CEO that included Lunera's current assets and

**Locke Lord LLP**
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

liabilities.  Bruggeman's presentation showed that Lunera's total current liabilities of $18.6 million exceeded the total sum of its assets of $13.6 million.

45.      In fact, during that same presentation, Bruggeman represented and acknowledged that the current and delinquent accounts payable due and owing Super Lighting, among other creditors, was nearly $11 million.  Super Lighting was at all relevant times Lunera's largest creditor. Bruggeman and the other Director Defendants knew that Lunera was still insolvent in April 2018 because the sum of its debts was greater than the sum of the fair market value of its assets *and* it was generally not paying its debts as they became due.

46.      Bruggeman further represented that the fair market value of Lunera's total inventory at the time was approximately $9.7 million.  In October 2018, Lunera and Bruggeman represented to Super Lighting that the fair market value of Lunera's inventory had decreased to $2.8 million, obviously because the inventory was sold and the revenues were diverted to Oro Networks instead of paying Super Lighting as promised.

47.      The Director Defendants also knew that Lunera was insolvent in September 2018 because the sum of its debts was still greater than the sum of the fair market value of its assets *and* it was generally not paying its debts as they became due, especially with respect to Super Lighting. Indeed, in September 2018, the Director Defendants were advised that their fiduciary duties to Lunera had expanded due to Lunera's insolvency such that they now had to maximize Lunera's value for the benefit of *all* residual claimants, a class that the Director Defendants now knew included Lunera's creditors.

48.      On September 17, 2018, and while the Director Defendants knew the Arbitration was pending and the outstanding debt was clearly leading to an arbitration award, the Director Defendants participated in a board of directors meeting at Lunera.  According to the meeting minutes, Director Defendants Bruggeman, McArthur, Greenberg, Westly, Coglizer, and Creer attended the meeting in person.  Upon information and belief, Defendant Director Rock participated via telephone.

49.      According to the meeting minutes, the meeting opened with Lunera's outside counsel, DLA, distributing a summary regarding "the fiduciary duties of directors and officers of a

**Locke Lord LLP**
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

corporation in the Company's financial condition." The company's financial condition at the time—and continuing through its dissolution in July 2019—was insolvency.

50.    In fact, the summary outline attached to the meeting minutes explained the "Fiduciary Duty of Directors and Officers of an Insolvent Corporation." DLA explained the "impact of insolvency" to the Director Defendants "when (1) its balance sheet liabilities exceed its assets, at fair value, or (2) it will be unable to pay its debts as they come due."

51.    The Director Defendants were further advised "in depth" of their fiduciary duties of loyalty, care, and good faith and the expanded application of those duties "to the corporate enterprise" during insolvency. The Director Defendants were specifically advised that "under this expanded fiduciary duty to the corporate enterprise, the directors' and officers' overall duty is to maximize the value of the corporate enterprise" for the benefit of "the corporation's *creditor*, as well as its stockholders."

52.    In particular, and of critical importance here, the Director Defendants were advised that the approval of fraudulent transfers during insolvency is a breach of fiduciary duty.

53.    Director Defendant Bruggeman testified in post-judgment discovery that he attended this meeting and understood these expanded fiduciary duties upon insolvency that were explained to him and to the other Director Defendants, including the duty to maximize the value of Lunera as a corporate enterprise for the benefit of stockholders *and creditors*.

54.    At no time after this September 2018 board meeting did the sum of the fair market value of Lunera's assets ever exceed the total sum of its liabilities. Rather, information provided to Super Lighting by Director Defendant Bruggeman following the September 2018 board meeting showed not only that Lunera's liabilities continued to significantly exceed its assets, but also that Lunera was rapidly depleting funds and contemplating bankruptcy.

55.    Despite understanding their expanded fiduciary duties, however, the Director Defendants, as discussed in detail below, deliberately disregarded the advice they received at the September 2018 board meeting by causing Lunera to fraudulently transfer substantially all of Lunera's assets while insolvent, during the pending Arbitration (and just several weeks before the Arbitration hearing that Lunera failed to appear at), and in conscious disregard of an attachment

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

order on Lunera's assets.  The facts described below demonstrate that the Director Defendants did so with the indisputable intent to hinder, delay, and defraud Super Lighting by putting those assets beyond Super Lighting's reach to admittedly ***"make it more difficult for Super Lighting … to seek to attach the [assets] and to enforce its arbitration award."***

**E.     The Director Defendants' Bad Faith and Breach of Fiduciary Duties to Lunera Regarding Elite Lighting's Proposed Acquisition of Lunera.**

56.     The Director Defendants had a fiduciary duty to maximize the economic value of Lunera for the benefit of its residual claimants, a category that—due to Lunera's insolvency—now included creditors as the initial beneficiaries of any increases in value.

57.     Following the September 2018 board meeting discussed above, Lunera continued to evaluate proposals that it received for the proposed acquisition of Lunera, including the liability to Super Lighting.  The Director Defendants knew that Super Lighting's consent was required for any acquisition given its status as Lunera's largest creditor.  The Director Defendants also knew that a potential acquisition would add significant value to Lunera and would be in the best interests of the company and its residual claimants.

58.     All proposals were unreasonable and unfair to Super Lighting because their terms were speculative, did not provide a sufficiently large guaranteed cash component to pay the outstanding amounts owed Super Lighting, and/or did not provide any certainty of payment to Super Lighting.  Regardless, Super Lighting continued to diligently negotiate with the Director Defendants in good faith.

59.     The Director Defendants, however, rejected all of Super Lighting's counter proposals. The Director Defendants did so despite knowing and acknowledging that the initial proposals would not likely be acceptable to Super Lighting.  In fact, the minutes of the September 17, 2018 board meeting show that the Director Defendants engaged in an extensive discussion of several proposals that were rejected by Super Lighting.

60.     For example, the Director Defendants acknowledged and agreed that the proposal from Corporate Defendant OEO "does not currently include a sufficiently large guaranteed cash component to pay the amounts owed to Super Lighting."

**Locke Lord LLP**
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

61.     The Director Defendants further acknowledged that the proposal by Elite Lighting ("Elite") "does not provide for certainty in payment of the amounts owed Super Lighting *and would likely not be acceptable to Super Lighting*" because "a significant portion of its payments to Super Lighting would be contingent on the amount of revenue generated by the standard lamp business."

62.     Despite their acknowledgments that the terms of the acquisition offers were unfavorable to Super Lighting, the Director Defendants falsely claimed in the Arbitration proceeding that Super Lighting interfered with Lunera's future by holding it hostage and blocking every proposed deal.   The arbitrator flatly rejected these claims in its Order granting the Writ of Attachment (discussed below), including those made in the supporting declaration of Director Defendant Bruggeman, as having no evidentiary foundation or actionable basis whatsoever.

63.     In October 2018, however, Director Defendant Bruggeman emailed Super Lighting and represented that Lunera "remain[s] committed to finding a solution that is acceptable to Super Lighting" regarding a proposed transaction with Elite.   Bruggeman once again acknowledged to Super Lighting that "Lunera's Board of Directors has a fiduciary responsibility to all of its creditors."

64.     Accordingly, on or around November 3, 2018, Bruggeman sent Super Lighting another term sheet setting forth the terms upon which Lunera's debt (including the Super Lighting debt) would be assumed by Elite in a deal valued at $6.9 million.   Unfortunately, Bruggeman's supposed "commitment to finding a solution" instead consisted of threatening Super Lighting via email that if it did not accept the new term sheet, Lunera "will end negotiations … and Lunera's assets would have to be liquidated at extremely low prices."   This same threat was also delivered to Super Lighting by Director Defendant Westly[1] during a meeting a few days earlier.

---

[1] Westly was a dominant influencer and decision maker at Lunera.   At all relevant times, The Westly Group (through its affiliated entities Westly Capital Partners Fund, L.P. and Westly Capital Partners Fund II, L.P.) was Lunera's largest shareholder.   Westly signed as a director and on behalf of The Westly Group when Lunera obtained financing from its primary banks, Silicon Valley Bank ("SVB") and Montage Capital ("Montage") in 2017.   On November 4, 2018, Westly asked Director Defendant Bruggeman, "[a]re we waiting to hear back from Super Lighting? Or should I proactively reach out to them?"   On November 16, 2018, Bruggeman told Westly that "OEO will join the meeting" and that Individual Defendant Einarsen "would be happy to meet with Westly today."   Westly also signed the Lunera's Certificate of Dissolution on behalf of the Lunera board of directors.

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

65. All of the Director Defendants knew that Lunera was insolvent at the time and that Super Lighting's claim was obviously leading to an arbitration award and judgment.

66. Additionally, on or about November 5, 2018, Lunera's outside counsel, Craig Tighe ("Tighe") of DLA, sent a letter to Super Lighting and reiterated the threat to accept the current proposal or else "Lunera's Board will have to move forward with shutting down the Company's operations and liquidate its assets."

67. Just like the previous Elite and OEO proposals that were one-sided and unfair to Super Lighting, as the Director Defendants themselves acknowledged, the current Elite proposal contained the same speculation and lack of certainty regarding payment of the accounts payable owed to Super Lighting. Rather, the deal was more about ensuring the continued development of Lunera's IoT, smart-lamp business that Super Lighting had declined to invest in.

68. For example, while Elite agreed to assume $5.5 million of the accounts payable owed to Super Lighting, there were no terms regarding the structure of the payment of that debt, including the amount or timing of payments. Further, assumption of the liability was conditioned on Lunera's inventory being sold for more than $2.5 million within one year from closing.

69. Super Lighting, however, remained willing to negotiate the Elite acquisition in good faith despite the threats of liquidation from Tighe and Director Defendants Bruggeman and Westly. Accordingly, on November 6, 2018, Super Lighting emailed a signed counter-proposal term sheet to Elite and Bruggeman for his and the other Director Defendants' consideration.

70. Rather than act in good faith and with due care and diligence to pursue a business strategy that they knew and believed would increase or maximize Lunera's value, the Director Defendants acted with a purpose other than advancing the best interests of Lunera and its residual claimants—retaliation against Super Lighting for its refusal to agree to their unconscionable and unrealistic terms.

71. Bruggeman and the other Director Defendants willfully refused to negotiate further and did not even provide a substantive response to Super Lighting's counter proposal. The Director Defendants' bad-faith refusal to continue negotiating with Super Lighting is made even more apparent by their efforts to shut Super Lighting out of further and ongoing negotiations with other

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

potential acquirers of Lunera.

72.     Following their receipt of Super Lighting's counterproposal on November 6, 2018, the Director Defendants continued to negotiate with OEO and others regarding a potential acquisition of Lunera's standard lamp business and its IoT business, but Super Lighting was not included in these negotiations.  Indeed, the Director Defendants wanted to ensure the survival of Lunera's IoT business at the direct expense of Super Lighting's rights and interests as a creditor.

73.     In fact, the Director Defendants terminated the Elite negotiations with Super Lighting in bad faith and in breach of their duties of good faith, care and loyalty to Lunera to also buy themselves more time to negotiate a sale of the IoT business *before* a ruling on Super Lighting's pending motion that sought an attachment lien on Lunera's assets (as discussed in more detail below).

74.     For example, on December 4, 2018, DLA's Tighe emailed Director Defendants Bruggeman, McArthur, and Westly regarding a potential private foreclosure sale of Lunera's IoT Assets.  Tighe suggested the sale **"*as a possible way make it more difficult for Super Lighting, post-sale of the standard lamp business, to seek to attach the IoT business assets and to enforce its arbitration award*."**

75.     Tighe further explained that under a foreclosure sale, "the claims of the borrower's creditors remain with the borrower and do not 'travel' with the assets foreclosed" such that "the IoT assets would transfer to NewCo while Super Lighting's payable would remain with Lunera."

76.     The Director Defendants' motive was clear.  Rather than engage in good faith actions and fulfil their duties of good faith, care and loyalty to Lunera toward a $6.9 million deal with Elite to maximize the value of Lunera for the benefit of all its residual claimants, the Director Defendants refused, at the last minute, to negotiate any further and walked away.

77.     In doing so, the Director Defendants deliberately placed their own self-interests above those of their fiduciaries—specifically, Lunera—and acted in bad faith, on an uninformed basis, with a purpose other than advancing the best interests of Lunera and its residual claimants through a value maximizing transaction.

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

78.     Instead, the Director Defendants elected to diminish Lunera's value, made Lunera's financial situation even more dire, and permitted Lunera to execute a fire sale and fraudulently transfer its remaining assets for grossly inadequate consideration and for the intended purpose of putting those assets beyond Super Lighting's reach to impede its ability to enforce its arbitration award.

79.     The Director Defendants did so in deliberate disregard of and reckless indifference to the interests of Lunera's residual claimants that included Super Lighting, leaving Lunera without any assets or the means to satisfy its obligations to all of its residual claimants.

80.     Indeed, the Director Defendants' bad faith and expressed desire to "put the screws to Super Lighting" is evident.  As Director Defendant Greenberg told his fellow Director Defendants in an email on November 2, 2018, just four days earlier, **"*[w]alk away from SL … Let them spend money to come after us.  SL will realize when they push us too far.*"**

81.     The Director Defendants' decision was so self-interested and one-sided that no reasonable person could conclude that the action or decision was beneficial to Lunera or its residual claimants.

**F.     Super Lighting Files an Emergency Motion for Writ of Attachment Against $9.9 Million Worth of Lunera's Assets.**

82.     Lunera's financial condition continued to worsen following the September 2018 board meeting and the Elite negotiations discussed above.  In fact, information provided to Super Lighting by Director Defendant Bruggeman in October and November 2018 showed that Lunera had very limited assets remaining, including only $775,000 in cash and approximately $2.8 million in inventory—amounts dwarfed by the $20 million in aggregate liabilities to creditors (including the $13 million admittedly owed to Super Lighting).  Bruggeman's forecasts showed the rapid depletion of the already very limited assets.

83.     Accordingly, on November 29, 2018, and to secure Super Lighting's ability to enforce an award granted in the pending Arbitration, Super Lighting filed an Emergency Motion for a Writ of Attachment (the "Attachment Motion") to secure Lunera's remaining assets.  The Attachment Motion sought a writ of attachment order on Lunera's corporate property in the amount

FIRST AMENDED VERIFIED COMPLAINT

**Locke Lord LLP**
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

of $9.99 million to secure the past-due invoices.

84.     The Director Defendants were advised of the filing of the Attachment Motion and knew that the purpose of the Attachment Motion was to attach a lien on Lunera's assets.   The Director Defendants further knew that Lunera's lighting inventory, among other property, would be subject to an attachment order and a lien if the Attachment Motion was granted.  In fact, Director Defendant Bruggeman provided a sworn declaration in support of Lunera's opposition to the Attachment Motion.  Bruggeman filed his supporting declaration on January 6, 2019—just days before the Attachment Motion was granted and the Director Defendants authorized and effectuated the fraudulent transfer of substantially all of Lunera's remaining assets.

85.     Once again, Lunera did not dispute its breach of the Agreement or the outstanding debt in its opposition to the Attachment Motion.  Rather, as alleged in detail below, the Director Defendants—knowing that both an attachment order and an Arbitration award in favor of Super Lighting was imminent—conspired with DLA to delay a ruling on the Attachment Motion so that Lunera could dump its remaining assets in a fire sale before a lien could attach.

86.     As described in more detail below, the Director Defendants' conduct was reckless, willful, and in deliberate and conscious disregard of the pending Arbitration, the pending Attachment Motion, as well as Super Lighting's interests as Lunera's largest creditor.  Indeed, not only did the Director Defendants effectuate the fraudulent transfer of assets they knew would be subject to a lien (e.g., Lunera's inventory), they continued to fraudulently transfer assets even *after* the Attachment Motion was granted, including the inventory that Lunera (through Director Defendant Bruggeman) identified to the emergency Arbitrator as well as cash proceeds to Oro Networks.

**G.     The Director Defendants Conspire to Transfer Lunera's Remaining Assets to Avoid Attachment and Deliberately Impede Super Lighting's Ability to Enforce its Arbitration Award.**

87.     As early as December 4, 2018, just fourteen days before Lunera shut down its business operations—and with knowledge that Lunera was insolvent and in the middle of Arbitration with Super Lighting with the Attachment Motion pending—the Director Defendants began to

1   execute their plan to fraudulently transfer Lunera's assets.

2   88.   Indeed, information obtained through post-judgment discovery establishes that the

3   Director Defendants did so with the actual intent of fraudulently putting those assets beyond Super

4   Lighting's reach before a lien could attach *and* to make it more difficult for Super Lighting to

5   enforce an arbitration award.  The information obtained further shows that the Director Defendants

6   acted in reckless indifference to the Attachment Motion and with knowledge that Super Lighting's

7   claim was leading towards an attachment lien on Lunera's remaining assets and an Arbitration award

8   in Super Lighting's favor.  The Director Defendants authorized Defendant Director Bruggeman to

9   execute their plan for the fraudulent transfer of Lunera's assets.

10   89.   For example, the IoT Assets were Lunera's most valuable asset.  In fact, on October

11   13, 2018, Director Defendant Bruggeman emailed Super Lighting about a possible investment by

12   Super Lighting in Lunera's IoT software business.  Bruggeman attached a copy of Lunera's "IoT

13   Software Business Plan" that included the projected revenue and income stream of Lunera's IoT

14   Assets over the next four years.  Lunera projected that revenue would increase from $8.7 million to

15   $101 million over the next four years, with profit increasing from $2.1 million to $24 million over

16   that same period.  Bruggeman testified that this was a "conservative" projection.

17   90.   The Director Defendants knew that the IoT Assets could have been available to

18   satisfy Super Lighting's claim or any future Arbitration award or judgment.  Yet, on December 4,

19   2018, with a ruling on the Attachment Motion expected at any time, DLA's Tighe emailed Director

20   Defendants Bruggeman, McArthur and Westly about a possible private foreclosure sale of Lunera's

21   IoT Assets.

22   91.   Tighe stated:

23      **"*As promised*, here is a quick overview of the potential private**
24      **foreclosure sale strategy.  I only suggest this as *a possible way***
        **to make it more difficult for Super Lighting … to seek to attach**
25      **the IOT business assets and to enforce its arbitration award."**

26   92.   On December 21, 2018, Tighe emailed Bruggeman explaining that the arbitrator "will

27   likely issue a ruling on the writ of attachment motion around Jan. 18" and that Lunera was given

28   time to file a supplemental brief in response to the Attachment Motion.  Bruggeman responded that

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

**"[a] bell rang … and an angel (i.e., Lunera) got its wings!!!  You are amazing."**  The Director Defendants bought themselves more time to try and unload Lunera's assets before a ruling on the Attachment Motion.  Tighe later emailed Bruggeman on December 31, 2018 about the sale of the IoT Assets and reiterated the desire to get the sale done **"before Super Lighting has a chance to get a lien."**[2]

93.    The Director Defendants also wanted to sell Lunera's remaining inventory before a ruling on the Attachment Motion.  On January 1, 2019, Director Defendant Bruggeman emailed Tighe, stating that "OEO is in the process of buying all of our LED lamp assets."  Further, on January 3, 2019, Director Defendant Bruggeman emailed Tim Weber of Accu-Logistics (the custodian of Lunera's inventory) ("ACCU") and Jim Rae of Corporate Defendant OEO to inform Mr. Weber that OEO "is buying all of the Lunera inventory."

94.    On January 14, 2019, DLA's Rajiv Dharnidharka emailed Bruggeman to inquire whether Lunera's remaining inventory had been sold yet because there was "no word from the arbitrator" on the Attachment Motion.  Tighe and Bruggeman (and the other Director Defendants) knew that Lunera's inventory would be subject to a lien if the Attachment Motion was granted. Tighe responded (copying Bruggeman) and explained that Lunera was "[s]elling [the] inventory in chunks."  As discussed in more detail below, the inventory was already being sold "in chunks" to avoid not only the Attachment Motion, but to also avoid the California Bulk Transfer Act and the Uniform Fraudulent Transfer Act.

---

[2] Despite its extensive efforts in post-judgment discovery, the issue of whether the IoT Assets have been fraudulently transferred, and if so to whom, remains a mystery.  To the extent the Director Defendants disclose, or Super Lighting otherwise discovers, facts inferring or evidencing the fraudulent transfer of the IoT Assets (or any other Lunera assets), Super Lighting reserves the right to amend this Complaint to allege that the transfer of the IoT Assets (or any other Lunera assets) was a fraudulent transfer and unlawful as a breach of fiduciary duty and to add all responsible parties as defendants.  Super Lighting believes, upon information and belief and documents obtained in post-judgment discovery, that the IoT Assets may have been transferred to entities within The Westly Group's portfolio of companies, including View, Inc.  Additionally, in June 2021, all of the assets of Oro Networks were acquired by SECO SpA, which formed a new company called SECO Mind US. Former Lunera CTO and former Oro Networks CEO, Ajay Malik, is now the CEO of SECO Mind US.  Super Lighting intends to promptly conduct appropriate third-party discovery, including of Mr. Malik, SECO Mind US, and View, Inc.

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

95.    The Director Defendants' plan and actual fraudulent intent is crystal clear—they sought to intentionally hinder, delay, and impede Super Lighting's collection and enforcement of an arbitration award by willfully putting Lunera's assets out of Super Lighting's reach.  It is equally clear that the Director Defendants knew that Super Lighting's claim was obviously leading to an arbitration award and an attachment lien on Lunera's assets.  All of the Director Defendants were aware of and were complicit in the plan to impede Super Lighting's ability to attach Lunera's assets and enforce an arbitration award.

96.    The Director Defendants' actual fraudulent intent is further demonstrated by the fact that they acted without any concern for, and in conscious indifference to, (i) the pending Attachment Motion and any resulting lien that might attach to Lunera's assets; (ii) trying to sell the assets during a pending Arbitration and prior to the Arbitration trial; and (iii) Super Lighting's legitimate claim and the availability of Lunera's assets to help satisfy that claim.

97.    Indeed, Bruggeman's post-judgment discovery testimony confirmed his and the other the Director Defendants' bad faith and disregard and contempt for the pending Attachment Motion and any resulting lien that might attach to Lunera's assets in Super Lighting's favor.  Bruggeman repeatedly emphasized that **"[w]hether Super Lighting got a lien or not was not part of the decision process," and that "this writ [of attachment], this lien, had no impact on my process that I was running to sell the assets."**  In fact, when asked if he simply didn't care one way or another whether Super Lighting obtained a lien, Bruggeman responded that **"[i]t was not in my consideration … in the selling of the asset."**

98.    Further, when asked if he and the other Director Defendants had any concern about Super Lighting obtaining a lien on Lunera's assets, Bruggeman answered that it was **"inconsequential"** because their only motivation was "**to sell the assets … regardless of the lien."**

99.    Bruggeman further testified that he wanted to maximize the value of the assets sold and return payment to creditors.  This was false, however, because (as discussed in detail below) the Director Defendants did nothing to attempt to maximize the value of Lunera's assets or otherwise engage in a neutral sale of substantially all of Lunera's assets for the benefit of all of Lunera's residual beneficiaries.  There was only the plan (in reckless coordination with knowingly improper

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

advice from outside counsel) to conceal the sale of those assets and put them out of Super Lighting's reach for the admitted purpose of impeding its ability to enforce its arbitration award, even if the assets were subject to a lien.

100.    As discussed in more detail below, the Director Defendants carried out that plan by knowingly causing Lunera to fraudulently transfer Lunera's inventory and patents—both before *and* after the Attachment Motion was granted—in secret transactions concealed from Super Lighting.

### H.    The Director Defendants Willfully Exclude Asset Information From the Emergency Arbitrator and Knowingly Approve the Sale of Substantially All of Lunera's Remaining Assets *After* Receiving Notice of a Decision on The Attachment Motion.

101.    On the morning of January 15, 2019, the emergency Arbitrator notified Lunera and Super Lighting that a decision had been rendered on Super Lighting's Attachment Motion.  The decision could not be released, however, until Lunera paid its outstanding balance for arbitration fees.

102.    Despite Lunera's representations that the balance would be paid right away, the Director Defendants stalled for days to once again buy themselves more time to transfer Lunera's assets before a lien could attach, as shown below.

103.    On January 18, 2019, only after Super Lighting paid Lunera's outstanding balance, the emergency arbitrator emailed Lunera and Super Lighting his decision granting the Attachment Motion.  The arbitrator held that "Super Lighting is entitled to an order attaching $9,995,876 worth of property in the possession and control of Lunera."  Accordingly, Lunera was ordered to identify certain assets to the emergency Arbitrator and to Super Lighting's counsel within five business days, including:

- "all bank accounts sufficient to enable an attachment lien to apply," and

- "all tangible property, including but not limited to inventory and any raw materials in its possession, custody, or control."

104.    The Director Defendants knew that the Attachment Motion had been granted and that Lunera was ordered to identify certain assets, including inventory, on which Super Lighting now had a lien.  In fact, Director Defendant Bruggeman testified that he was informed of the granting of the

**Locke Lord LLP**
**300 South Grand Avenue, Suite 2600**
**Los Angeles, CA 90071**

Attachment Motion and understood that Super Lighting now had a lien on nearly $10 million worth of Lunera property.

105.    In response to the order granting the Attachment Motion, Lunera identified six bank accounts it held with SVB, as well as a spreadsheet that listed more than 91,000 units of Lunera's inventory located at ACCU.  The bank accounts and inventory were listed in an official Writ of Attachment (the "Writ") signed by the emergency Arbitrator on January 30, 2019.

106.    Bruggeman testified that he understood that the identified inventory and bank accounts were subject to the Writ with a lien in favor of Super Lighting.  Bruggeman further testified that he reviewed the asset information that was compiled and identified to the emergency Arbitrator, including the bank accounts and inventory, and that the information provided was **"totally complete."**

107.    That representation was knowingly false, however, because the information provided to the emergency Arbitrator was not complete.  As discussed in more detail below, The Director Defendants intentionally and knowingly failed to identify more than **235,000** units of inventory, the bulk of which Bruggeman, with the approval of his fellow Director Defendants, had already caused Lunera to fraudulently transfer to Corporate Defendants OEO and Advanced Trading just days before the Attachment Motion was granted.  Incredibly, in a further act of reckless indifference and deliberate disregard, Bruggeman knowingly caused Lunera to transfer the remainder of that inventory to OEO three days *after* Lunera was notified of a decision on the Attachment Motion, and *on the very same day* that Lunera received notice that the Attachment Motion was granted.

108.    On January 15, 2019—the same day that Lunera received notice that a decision was rendered on the Attachment Motion and with knowledge of Lunera's insolvency, the pending Arbitration, and the upcoming trial—the Director Defendants held a telephonic board meeting.  According to the meeting minutes, the Director Defendants approved **"the sale of substantially all of [Lunera's] assets, comprised of the Company's inventory, the Company's standard lamp business intellectual property assets (the "LED IP Assets"), and the Company's [IoT Assets]."**

109.    The Director Defendants further authorized Bruggeman to negotiate the sale of the inventory "in bulk transactions and on the terms and conditions that Mr. Bruggeman determines are

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

reasonable for the Company, and to sell the LED IP Assets … provided that the sales price is not less than $125,000."

110.    Post-judgment discovery revealed that the Director Defendants did not discuss or otherwise act on any informed basis through available material information to determine what terms and conditions of sale would be reasonable for Lunera, let alone in the best interests of Lunera and all of its residual claimants.  There were no board meeting minutes, information or any other documents reflecting that the Director Defendants acted on any informed basis to ensure that the terms and conditions of the inventory and patent sales would preserve maximum corporate value for all residual claimants, including ensuring that Lunera would receive adequate consideration and that the sales were beneficial to Lunera and its residual claimants.

111.    Indeed, the only apparent "informed" but self-interested decisions the Director Defendants made were (i) to authorize the sale of the inventory in bulk transactions to avoid the Attachment Motion and the Uniform Fraudulent Conveyance Act, and (ii) to quickly liquidate the assets in a fire sale by authorizing Bruggeman to sell the assets as he saw fit, both of which were decisions consistent with the Director Defendants' admitted desire to make it more difficult for Super Lighting to enforce its arbitration award.

112.    For example, the LED IP Assets consisted of Lunera's 37 patents related to LED lighting (the "Patents").  The Director Defendants authorized Bruggeman "to conduct a sales process for the [Patents] and to present the purchase offers received for such assets to the Board for evaluation and approval of the purchaser and the terms and conditions for the sale."  There was no board meeting or discussion, however, concerning how the sales process for the Patents should or would be conducted or any other informed steps taken to otherwise ensure the legitimacy of the sales process.  Nor was there any board meeting or discussion or any other documents reflecting that the Director Defendants acted on any informed basis through available material information (including through outside consultants or experts in the fields of patent and inventory valuation) to attempt to ascertain the reasonable or fair market value of the Patents and inventory.

113.    Indeed, the $125,000 sale price for the Patents is even lower than the application costs for the Patents, demonstrating that the sale was not reasonable for Lunera; was not in the best

interests of Lunera and all its residual claimants; and did not preserve maximum corporate value for all residual claimants. Nor were any purchase offers for the Patents presented to the Board for evaluation and approval of the purchaser and the terms and conditions for the sale following the January 15, 2019 board meeting, as Bruggeman and his fellow Director Defendants were required to do.

114.    Despite the Director Defendants deeming it "in the best interests" of Lunera's creditors to sell substantially all of Lunera's assets, neither the minutes of the January 15, 2019 board meeting nor any other documents reflect any discussion regarding any creditors, including Super Lighting, let alone any discussion or facts demonstrating that the decision was made on an informed basis that considered the best interests of all of Lunera's residual claimants.

115.    The Director Defendants knew that the inventory, Patents, and IoT Assets could and should be available and reserved for the creditors, including satisfaction of Super Lighting's claim as the largest residual claimant.  In approving the sale of substantially all of Lunera's assets, the Director Defendants acted in bad faith and in deliberate and conscience disregard of and reckless indifference to the Attachment Motion, the lien on the inventory, the pending Arbitration, and Lunera's residual claimants, including Super Lighting as Lunera's largest creditor and residual claimant.

116.    By approving the sale of substantially all of Lunera's assets under these circumstances, including with knowledge of Lunera's insolvency and of their expanded fiduciary duties to Lunera, the Director Defendants breached their fiduciary duties of good faith, care and loyalty to Lunera by acting in self-interest and for purposes other than advancing the best interests of Lunera and its residual claimants or maximizing the value of Lunera for the benefit of all its residual claimants.

117.    In doing so, the Director Defendants engaged in intentional misconduct and knowingly and willfully acted with purposes other than advancing the best interests of the corporation and maximizing the value of the corporation for the benefit of creditors, such as Super Lighting, as the equitable owners of the corporation's assets due to Lunera's insolvency.

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

118.    By approving the sale of substantially all of Lunera's assets under these circumstances, the Director Defendants wrongfully and intentionally diminished Lunera's value and decreased the availability of assets available to pay creditors such as Super Lighting, including inventory assets that the Director Defendants knew were subject to a lien in Super Lighting's favor.

119.    Indeed, in his post-judgment discovery deposition, Bruggeman testified about the January 15, 2019 board meeting and the Director Defendants' decision to sell substantially all of Lunera's assets.  Bruggeman confirmed that the inventory, Patents, and IoT Assets comprised substantially all of Lunera's assets at the time and admitted that **"[w]e believed that the assets we had were worth more to *someone else* than they were to [Lunera]."**  The Director Defendants, however, willfully acted to make certain that the "someone else" was not Super Lighting.

120.    In addition, around the same time as the fraudulent transfers discussed below, the Director Defendants cut Super Lighting out of the pro rata share of payments to Lunera's residual beneficiaries, including unsecured creditors.  Lunera paid its investors who owned convertible debt of approximately $3.68 million.  The Director Defendants approved an allocation of payments to the investors in the actual amount each was owed, as a straight average.

121.    The Director Defendants also approved a pro rata allocation of the remaining funds to Lunera's unsecured creditors.  Specifically, "the pro rata share was based on the total amount that we owed each of the creditors."

122.    The Director Defendants, however, favored other unsecured creditors (including, upon information and belief, Future Electronics) as Super Lighting received no pro rata share of Lunera's remaining assets.

I.    **The Fraudulent Transfer of Lunera's Inventory to OEO and Advanced Trading.**

1.    *More Than 327,000 Units of Lunera Inventory are Fraudulently Transferred*

123.    As alleged above, the Director Defendants knowingly and willfully failed to identify more than **235,000** units of Lunera inventory to the emergency Arbitrator in response to his order granting the Attachment Motion.  Lunera invoices and SVB banking statements obtained in post-judgment discovery show that Bruggeman, acting with the other Director Defendants' knowledge

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

and authority, and in deliberate disregard of the advice from counsel they received in the September 2018 board meeting, caused Lunera to fraudulently transfer that and thousands of additional units of Lunera inventory to Corporate Defendant OEO knowingly through a sham company—Advanced Trading—for consideration of $48,000 that was grossly negligent and for less than reasonably equivalent value.

124.    The Director Defendants failed to cause Lunera to obtain any independent appraisal or valuation of the fair market value of Lunera's inventory prior to the transfers, which Super Lighting estimates at more than $1.6 million based on its unit cost and pricing of standard LED lighting products.

125.    The Director Defendants further failed to act on any informed basis or to otherwise take any steps to ensure that the inventory was the subject of a legitimate sales process to maximize the value of the inventory for the benefit of Lunera's residual claimants, including Super Lighting as its largest creditor and residual beneficiary. Instead, Bruggeman—acting with the other Director Defendants' knowledge and authority—dumped the inventory in a fire sale to avoid attachment by Super Lighting, even selling a portion of the inventory *before* he received selling authority at the January 15, 2019 board meeting.

126.    In his post-judgment discovery deposition, Bruggeman admitted to Lunera selling its remaining inventory in chunks, including to OEO.  As alleged earlier, Bruggeman began negotiating the sale of Lunera's remaining inventory while the Attachment Motion was pending and, indeed, shortly before it was granted.

127.    Bruggeman corresponded via email with OEO's Jim Rae, and Individual Defendants and OEO managing principals Einarsen and Butz (through their OEO email addresses) regarding the inventory, as well as OEO's potential acquisition of all of Lunera's assets.  Einarsen and Butz are listed as OEO's sole principal Managers in OEO's current filings with the Illinois and Nevada Secretary of State's Offices.  Those same filings also list OEO's principal office address, as well as the business address provided for Einarsen and Butz, as 143 East Main Street, Lake Zurich, Illinois 60047.

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

128.    According to the Delaware Secretary of State's Office, Corporate Defendant Advanced Trading was formed and incorporated on December 27, 2018.  According to the Illinois Secretary of State's Office, Advanced Trading was registered with the Illinois Secretary of State on January 17, 2019.  Those same records currently list Einarsen and Butz as the sole principal Managers of Advanced Trading.  Advanced Trading's principal office address, as well as the business address of its two principals, Einarsen and Butz, is the same Lake Zurich, Illinois address as OEO.  OEO and Advanced Trading also share the same registered agent for service of process in Illinois.

129.    Lunera's inventory was transferred to OEO through Advanced Trading.  For example, Bruggeman caused Lunera to issue several invoices that document the transfer of Lunera's inventory to OEO through Advanced Trading.  Each invoice contains the quantity, description, and item code of the Lunera inventory sold, a shipping date, a "PAID" date stamp, and wiring instructions for payment to Lunera's SVB bank account.  No prices are listed in the invoices.

130.    The following invoices were issued by Lunera to Advanced Trading on **January 10, 2019—just days before the Attachment Motion was granted:**

- Invoice No. SI-85608 was issued for 25,888 units of 18 different types of inventory.  The invoice has a "PAID" stamp date of "01/11/19" and reflects a shipping date of "1/10/19"

- Invoice No. SI-85608 was issued for 13,697 units of 18 different types of inventory.  The invoice has a "PAID" stamp date of "01/11/19" and reflects a shipping date of "1/10/19"

- Invoice No. SI-85608 was issued for 87,901 units of two different types of inventory.  The invoice has a "PAID" stamp date of "01/11/19" and reflects a shipping date of "1/10/19"

131.    Copies of identical invoices identify OEO, not Advanced Trading, as the purchaser.  These invoices do not contain a "PAID" date stamp, but they do reflect the unit price for the inventory and a total balance due of $35,000.  Lunera's SVB checking account statements show that Lunera received a wire transfer from Advanced Trading on "1/11/2019"—the same date as the

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

"PAID" date stamp on the invoices issued to Advanced Trading—for $35,000.[3]

132.   Bruggeman also caused Lunera to issue the following two invoices to Advanced Trading on **January 18, 2019—three days after Lunera was notified of a decision on the Attachment Motion, and the same day Lunera was notified that the Attachment Motion was granted:**

- Invoice No. SI-85609 was issued for 44,464 units of 18 different types of inventory.  The invoice has a "PAID" stamp date of "01/18/19" and reflects a shipping date of "1/18/19"

- Invoice No. SI-85609 was issued for 63,210 units of 13 different types of inventory.  The invoice has a "PAID" stamp date of "01/18/19" and reflects a shipping date of "1/18/19"

133.   Lunera's SVB checking account statements also show that Lunera received a second wire transfer from Advanced Trading on "1/18/2019"—the same date as the "PAID" date stamp on the January 18 invoices issued to Advanced Trading—for $13,000.

134.   The Director Defendants further caused Lunera to transfer (a) the more than 91,000 units of inventory that was identified by Lunera (through Bruggeman) in response to the order granting the Attachment Motion and listed in the Writ, and (b) 170 pallets of inventory in January 2019 through consignment to a third party—Outback Equipment Company ("Outback")—for $27,000, while the Attachment Motion was pending. Outback's testimony and documents produced during post-judgment discovery confirmed that Outback sold Lunera's inventory, but Outback refused to identify the buyer(s).  Bruggeman confirmed the sale of the more than 91,000 units of inventory during his deposition but could not recall who purchased it.  As explained above, however, on January 3, 2019, Bruggeman told ACCU via email that OEO is "buying all of the Lunera inventory."

135.   Upon information and belief, all of Lunera's inventory was transferred to OEO and/or Advanced Trading.  Further, Bruggeman knew (and upon information and belief, all of the Director Defendants knew) that Advanced Trading was set up as a sham corporation to further conceal the

---

[3] The listed unit price of $0.27 was grossly low and disproportionate to the unit price of the inventory Super Lighting sold to Lunera, which varied from $2.70 to $70.00.

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

inventory transfers from Super Lighting.  All of the inventory transfers were concealed from Super Lighting.

136.    Bruggeman's testimony and documents obtained in post-judgment discovery further confirmed that all of the inventory was unencumbered at the time of transfer.  The Director Defendants caused Lunera to pay SVB and Montage to remove all liens and security interests on Lunera's inventory and Patents prior to transfer.

137.    The Director Defendants caused Lunera to effectuate the foregoing transfers of inventory with knowledge that (a) Lunera was insolvent and their fiduciary duties expanded to creditors such as Super Lighting; (b) Lunera owed Super Lighting more than $13 million and that it was in the middle of a pending Arbitration with Super Lighting; (c) the inventory could and should be reserved and made available for the satisfaction of Super Lighting's claim; (d) Super Lighting's $13 million claim was obviously leading to a substantial arbitration award and judgment; (e) the Attachment Motion was pending and, if granted, would subject the inventory to a lien in Super Lighting's favor; (f) the transfers were concealed from Super Lighting; and (g) the consideration for the transfers was grossly negligent and for less than reasonably equivalent value.

138.    The Director Defendants transferred Lunera's inventory (a) with deliberate disregard and reckless indifference to Super Lighting's interests and rights as Lunera's largest creditor and equitable owner of Lunera's assets; and (b) for the intended purpose of avoiding a lien and placing the inventory beyond Super Lighting's reach to delay, hinder, and impede its ability to enforce its arbitration award.

139.    The deliberate indifference and fraudulent intent exhibited by the Director Defendants is underscored by their decision to (a) willfully cause Lunera to transfer inventory to OEO and/or Advanced Trading even *after* the Attachment Motion was granted and knowing that a lien had attached, (b) knowingly fail to identify more than 235,000 units of inventory to the emergency Arbitrator in response to his order granting the Attachment Motion; and (c) willfully transfer more than 91,000 units of inventory that they knew was listed in the Writ and subject to the attachment lien.

140.   The Director Defendants' above-described conduct injured Super Lighting because it diminished Lunera's value and eliminated all remaining Lunera assets otherwise available to satisfy Super Lighting's claim.

141.   Additionally, by causing Lunera to make the fraudulent transfers of inventory as described above, the Director Defendants engaged in intentional misconduct and breached their duties of good faith, care, and loyalty to Lunera by failing to act on an informed basis (including failing to ensure that Lunera conducted an adequate sales process and received adequate consideration for the transfers); acting with self-interest and a purpose other than advancing the best interests of Lunera and its residual claimants, and failing to maximize the value of Lunera for the benefit of its residual claimants, including Super Lighting.

142.   The foregoing fraudulent transfers were so self-interested and one-sided that no ordinary prudent person could conclude that they were made in good faith, on an informed basis, that Lunera received adequate consideration for the transfers, that the transfers were beneficial to Lunera and its residual claimants, including Super Lighting, or that the transfers preserved maximum value for distribution to Lunera's residual claimants.

### 2.   *OEO, Advanced Trading, and Individual Defendants Einarsen and Butz Were Complicit in the Director Defendants' Fraud*

143.   OEO, Advanced Trading, and Einarsen and Butz (as the alter egos of Advanced Trading and vice versa) did not take the Lunera inventory for reasonably equivalent value or in good faith.  Indeed, they knew or through due diligence and investigation should have known that the unit prices and consideration of $48,000 for the inventory was grossly below fair market value.

144.   Additionally, OEO, Advanced Trading, and Einarsen and Butz (as the alter egos of Advanced Trading and vice versa) had prior notice and direct knowledge of facts and circumstances concerning the Director Defendants' fraudulent intent.  At a minimum, these facts and circumstances were so obvious that they should have caused the foregoing Defendants to diligently investigate further into Lunera's intent and purpose behind the inventory transfers, which they failed to do. Regardless, OEO, Advanced Trading, and Einarsen and Butz (as the alter egos of Advanced Trading and vice versa) were complicit in, and aided and abetted, the Director Defendants' fraudulent

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

transfers and efforts to impede Super Lighting's ability to enforce its arbitration award.

145.   For example, OEO's two controlling principals, Einarsen (its CEO) and Butz (its President), conspired and intentionally formed Advanced Trading as a mere shell company and conduit to effectuate and conceal the fraudulent transfer of Lunera's inventory to OEO (through Advanced Trading) for the intended purpose of placing those assets beyond Super Lighting's reach. Bruggeman also knew that Advanced Trading was set up as a sham corporation to further conceal the inventory transfers from Super Lighting.

146.   It is no coincidence that Advanced Trading was (i) organized and incorporated in Delaware just *two weeks prior* to the first transfer of Lunera's inventory, and (ii) registered in Illinois *the day before* the second transfer of inventory.  It is equally telling that Advanced Trading does not appear to have had any other ongoing business operations or activities whatsoever since the transfers were effectuated, let alone any employees.

147.   Indeed, there is no mention or reference to Advanced Trading anywhere on OEO's website and social media pages or on Einarsen's and Butz's personal LinkedIn pages.  Nor has Advanced Trading made any corporate filings with the Delaware Secretary of State's Office since December 27, 2018—the date of its incorporation.  Other than being formed for no other purpose than as a one-time vehicle for fraudulently transferring Lunera's inventory to OEO, Advanced Trading exists as little more than a legal fiction.

148.   Einarsen's and Butz's motive in forming and using Advanced Trading as their alter ego and as a facade for concealing OEO's fraudulent acquisition of Lunera's inventory is evident— they needed to create a fiction to illegitimately avoid taking on personal liability for their fraudulent transfers.  The reason is that, prior to the transfers of Lunera's inventory at issue, OEO, Einarsen, and Butz knew of the fraudulent nature of the transfers and had a **"fear of Super Lighting claiming fraudulent conveyance."**

149.   For instance, OEO, Einarsen, and Butz had prior knowledge of Lunera's unpaid debt of $13 million owed to Super Lighting and the pending Arbitration.  On December 5, 2018, OEO's Einarsen (with a "cc" to Messrs. Butz and Rae) emailed Bruggeman and requested and received "a copy of the current Super Lighting lawsuit that was filed."

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

150.    OEO, Einarsen, and Butz, also knew, or through due diligence and investigation should have known, of the pending Attachment Motion, and that Lunera's inventory would be, and ultimately was, subject to an attachment lien in Super Lighting's favor.  OEO, Einarsen and Butz also knew that Super Lighting's claim was obviously leading to a substantial arbitration award and that the Lunera inventory (and other assets) could be used to help satisfy that claim.  Emails further confirm OEO's, Einarsen's and Butz's knowledge that Lunera would be transferring substantially all of its assets and would be doing so *prior to the upcoming Arbitration hearing and trial*.

151.    For example, on January 2, 2019, OEO's Mr. Rae (with a "cc" to Messrs. Butz and Einarsen) emailed Bruggeman and asked:

**"How does Lunera plan on responding to the upcoming arbitration in regards to transferring Lunera's assets immediately prior to the arbitration hearing without complying with the requirements of either the California Bulk Sales Act or the California Uniform Voidable Transactions Act?"**

152.    Acting in a flurry to—as DLA's Mr. Tighe put it—help "OEO get over its fear of Super Lighting claiming fraudulent conveyance …," Bruggeman emailed OEO (Messrs. Einarsen and Rae) on December 10, 2018, regarding "ways that we might be able to finish" OEO's potential acquisition of Lunera's assets.  In his email, Bruggeman suggested the "private foreclosure sale of the business' assets to OEO."  Bruggeman was suggesting the same private foreclosure sale that was previously suggested by DLA's Tighe on December 4, 2018 "as a possible way to make it more difficult for Super Lighting … to seek to attach the IOT business assets and to enforce its arbitration award."

153.    OEO's, Einarsen's, and Butz's knowledge of the Director Defendants' actual fraudulent intent and its fear of a fraudulent conveyance claim by Super Lighting was so obvious that they "wanted [Director Defendant] Westly to indemnify [OEO] against any legal fees OEO incurs in any legal action that Super Lighting might bring against them."  Indeed, earlier in his December 10, 2018 email suggesting the private foreclosure sale, Bruggeman offered to ease OEO's fears.  Bruggeman asked OEO (Messrs. Einarsen and Rae) if "your bank, and its counsel, might support the Asset Purchase if Lunera … agreed to indemnify and defend OEO in connection with any fraudulent conveyance action, with Lunera having the right to assume the defense?"

**Locke Lord LLP**
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

154.   OEO, Einarsen, and Butz also had prior knowledge of Lunera's insolvency.   On January 3, 2019, Bruggeman forwarded OEO (Messrs. Einarsen and Rae) an email from DLA's Tighe regarding ways to avoid application of the California Bulk Transfer Act and Uniform Fraudulent Transfer Act, including selling the inventory in chunks.   DLA's email explained that one of the elements of a fraudulent transfer (insolvency) is already satisfied because of "Lunera's financial condition."

155.   OEO and Bruggeman continued to look for ways to transfer Lunera's assets and "eliminate[]" fraudulent transfer issues.   For example, on January 6, 2019, Mr. Rae emailed Bruggeman (with a "cc" to Messrs. Einarsen and Butz) concerning restructuring the transfer of the inventory and Patents, including for the reason that "patent resellers like [Corporate Defendant] Tynax have a policy of not purchasing from insolvent companies."

156.   Incredibly, Mr. Rae's proposal for the inventory even included a "commission" to Bruggeman—a Lunera director and "insider"—for facilitating a proposed sale of a $151,0000 chunk of inventory to a third party (1000bulbs.com) to avoid application of the Bulk Transfer Act.   Indeed, Mr. Rae's email confirmed that the "current book valuation of Lunera's inventory is approximately $2M," and proposed that OEO purchase over $410,000 worth of that inventory for $41,000.

157.   Tellingly, OEO's proposed acquisition of all of Lunera's assets did not take place because OEO's bank and investor (Midwest Bank) would no longer support the deal given the pending Arbitration with Super Lighting and the "significant money and time to litigate" a fraudulent conveyance lawsuit by Super Lighting.   All of the Director Defendants were advised by Bruggeman via email of OEO's bank's decision.

158.   All of the foregoing facts and circumstances put OEO, Advanced Trading, Einarsen, and Butz on notice of the Director Defendants' fraudulent intent.   At a minimum, those facts and circumstances should have caused OEO and Advanced Trading (and Einarsen and Butz) to diligently investigate further into the purpose of the transfers.

159.   Instead of investigating, OEO (through Einarsen, Butz and Advanced Trading) proceeded with the transactions through a sham entity that was formed solely for facilitating and concealing the fraudulent transfers of Lunera's inventory to OEO through Advanced Trading.   OEO,

Advanced Trading, Einarsen, and Butz were complicit in, and aided and abetted, the fraudulent transfers of Lunera's inventory for the purpose of placing those assets beyond Super Lighting's reach to delay, hinder, and impede its ability to enforce its arbitration award and Judgment.

160.    Einarsen and Butz, as the alter egos of Advanced Trading and vice versa, are personally liable for the fraudulent transfers because of their abusive use of the corporate form solely as a vehicle to effectuate and conceal the fraudulent transfer of Lunera's inventory.

**J.    The Fraudulent Transfer of Lunera's Patents to Tynax and Signify.**

*1.  Lunera Transfers 37 Patents for Grossly Low Consideration of $125,000*

161.    Documents obtained in post-judgment discovery show that Bruggeman, acting with the other Director Defendants' knowledge and authority, and in deliberate disregard of the advice from counsel they received in the September 2018 board meeting, caused Lunera to transfer its 37 Patents to Corporate Defendant Tynax (who, as broker, was acquiring the Patents on behalf of and at the request of Signify) for consideration of $125,000 that was grossly negligent and for less than reasonably equivalent value.  Once again, the Director Defendants caused Lunera to liquidate the assets in a fire sale to avoid potential attachment by Super Lighting and to impede its ability to enforce its arbitration award.  The Patent transfers were concealed from Super Lighting.

162.    The Director Defendants failed to cause Lunera to obtain any independent appraisal or valuation of the fair market value of Lunera's Patents prior to the transfers.

163.    The Director Defendants further failed to act on any informed basis or to otherwise take any steps to ensure that the Patents were the subject of a legitimate sales process to maximize the value of the Patents for the benefit of Lunera's residual claimants, including Super Lighting as its largest creditor and residual beneficiary.

164.    Instead, Bruggeman—acting with the other Director Defendants' knowledge and authority granted him in the January 2019 board meeting—conducted a fire sale "at light speed" just *three days* after that board meeting and dumped the Patents for the bare minimum (and grossly negligent) amount for which the other Director Defendants had recklessly authorized him to sell the Patents.

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

FIRST AMENDED VERIFIED COMPLAINT

165.     In fact, Bruggeman's "sales process" and negotiations on behalf of Lunera consisted merely of an initial telephone conversation with Tynax in December 2018 in which Bruggeman said he would sell the Patents to Tynax "if Tynax came up with a better price" than $100,000 and "if we could close the transaction quickly." Signify had asked Tynax to try purchasing the Lunera Patents. Tynax offered $125,000 during the call and Bruggeman immediately agreed to it.

166.     On January 18, 2019, the Director Defendants (through Bruggeman) caused Lunera to enter into an IP Transfer Agreement with Tynax for the transfer of Lunera's 37 Patents to Tynax in exchange for $125,000. The Patents were unencumbered at the time of transfer because the Director Defendants previously caused Lunera to pay SVB and Montage to remove all liens and security interests on Lunera's inventory and Patents prior to transfer.

167.     That same day, Tynax transferred the Patents to Signify in exchange for $160,000 ($125,000 purchase price, plus a $35,000 commission to Tynax) pursuant to an IP Transfer Agreement.

168.     The Director Defendants' actual fraudulent intent is underscored by the fact that Bruggeman negotiated the sale of the Patents to Tynax in December 2018—while the Attachment Motion was pending and well *before* the January 15, 2019 board meeting that authorized him to negotiate the sale of the Patents. The Director Defendants knew that the Attachment Motion was pending and, if granted, might have subjected the Patents to a lien in Super Lighting's favor.

169.     In fact, on December 19, 2018, Tynax's Chairman, David Smith, emailed DLA's Tighe confirming that **"John [Bruggeman] wants to move at light speed and we're going to try to break a world record for a transaction closing here."** Just two days earlier, on December 17, 2018, Mr. Smith emailed Signify, stating that **"I've never had such a crazy deadline for a patent sale before. Negotiated a deal and drafted an option and a patent purchase agreement in about 2 hours … phew!"**

170.     Mr. Smith's December 18, 2018 email confirmed the grossly low consideration for less than equivalent value. Mr. Smith emphasized to Signify that $125,000 is **"a real bargain considering the number of patents."**

171.     The Director Defendants' fraudulent intent is further substantiated by the transfer of the proceeds from the $125,000 sale of the Patents to Tynax.  On January 28, 2019, Tynax and Lunera (through Bruggeman and at his request) formally amended the payment instructions by letter agreement.  The amended instructions provided that only $20,000 of the sale proceeds would go to Lunera.  Remarkably, the largest portion of the proceeds went to Lunera's lawyers, DLA, with the remaining $50,000 diverted to Oro Networks.  There was no legitimate business purpose for knowingly paying DLA and Oro Networks nearly all of the proceeds while Lunera was insolvent and *after* the Attachment Motion was granted.

172.     Just a few days later, on February 1, 2019, DLA's Tighe was concerned about Tynax "not coming through" with payment (obviously because of its concerns over a fraudulent conveyance action).  Mr. Tighe asked Bruggeman to instead wire the $55,000 payment due to DLA "**from the unrestricted funds you have.**"  As of February 1, 2019, all of Lunera's SVB bank accounts (including its checking accounts) were attached with a lien.  There should have been no unrestricted funds because Lunera was ordered to identify "all bank accounts" to the emergency arbitrator in response to the order granting the Attachment Motion.  Indeed, Mr. Tighe was concerned that Lunera's "unrestricted" bank account would get "blocked."

173.     The Director Defendants caused Lunera to effectuate the foregoing transfers of its 37 Patents with knowledge that (a) Lunera was insolvent and their fiduciary duties expanded to creditors such as Super Lighting; (b) Lunera owed Super Lighting over $13 million and that it was in the middle of a pending Arbitration with Super Lighting; (c) the Patents could and should be reserved and made available for the satisfaction of Super Lighting's legitimate claim; (d) Super Lighting's $13 million claim was obviously leading to a substantial award and judgment lien; (e) the transfers were concealed from Super Lighting; and (f) the consideration for the transfers was grossly negligent or for less than reasonably equivalent value.

174.     The Director Defendants transferred Lunera's Patents (a) with deliberate disregard and reckless indifference to Super Lighting's interests and rights as Lunera's largest creditor and equitable owner of Lunera's assets; and (b) for the intended purpose of avoiding a judgment lien and placing the Patents beyond Super Lighting's reach to delay, hinder, and impede its ability to enforce

its arbitration award.

175.    The Director Defendants' above-described conduct injured Super Lighting because it diminished Lunera's value and eliminated all remaining assets otherwise available to satisfy Super Lighting's claim.

176.    Additionally, by causing Lunera to make the fraudulent transfers of Patents as described above, the Director Defendants engaged in intentional misconduct and breached their duties of good faith, care, and loyalty to Lunera by failing to act on an informed basis (including failing to ensure that Lunera conducted an adequate sales process and received adequate consideration for the transfers); acting with self-interest and a purpose other than advancing the best interests of Lunera and its residual claimants, and failing to maximize the value of Lunera for the benefit of its residual claimants, including Super Lighting.

177.    Additionally, the foregoing fraudulent transfers were so self-interested and one-sided that no ordinary prudent person could conclude that they were made in good faith, on an informed basis, that Lunera received adequate consideration for the transfers, that the transfers were beneficial to Lunera and its residual claimants, including Super Lighting, or that the transfers preserved maximum value for distribution to Lunera's residual claimants.

### 2. Tynax and Signify Were Complicit in the Director Defendants' Fraud

178.    Tynax was asked by Signify to purchase the Lunera Patents for Signify. Tynax and Signify did not take the Patents for reasonably equivalent value or in good faith. Additionally, Tynax and Signify had prior notice and direct knowledge of facts and circumstances concerning the Director Defendants' fraudulent intent, including the "fire sale" of the Patents, the grossly low consideration for the Patents, Lunera's insolvency, and the absence of any fair market appraisal or valuation of the Patents provided by Bruggeman or Lunera.   At a minimum, these facts and circumstances were so obvious that they should have caused Tynax and Signify to diligently investigate further into Lunera's intent and purpose before the Patents were transferred, which they failed to do.  Regardless, Tynax and Signify were complicit in, and aided and abetted, the Director Defendants' fraudulent transfers and efforts to impede Super Lighting's ability to enforce its arbitration award.

**Locke Lord LLP**
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

179.   For example, Tynax and Signify knew that the consideration of $125,000 for the Patents was grossly below fair market value.   As shown above, emails between Tynax and Signify confirm their understanding of what a "real bargain" it was considering the large number of patents involved.   Those same emails also confirm Tynax's and Signify's understanding of the unprecedented fast pace that Bruggeman was moving at to close the transaction.   Those facts alone should have caused Tynax and Signify to diligently investigate further into Lunera's intent and purpose behind the transfers.

180.   Emails confirm that Tynax and Signify also knew, or through due diligence and investigation should have known, of Lunera's insolvency; Lunera's unpaid debt of $13 million owed to Super Lighting; the pending Arbitration; the pending Attachment Motion; and that Lunera's Patents might be subject to an attachment lien in Super Lighting's favor.   Tynax and Signify also knew, or through due diligence and investigation should have known, that Super Lighting's claim was obviously leading to a significant arbitration award and judgment lien and that the Patents could be used to help satisfy that claim.

181.   For example, on December 20, 2018, Tynax's Mr. Smith emailed Bruggeman and DLA's Tighe regarding the proposed sale of the Patents.   Mr. Smith confirmed that Bruggeman and Tighe had previously **"informed [Tynax] that Lunera is currently in a board managed wind down."**   Mr. Smith further noted his knowledge that **"there are news reports that the company is shutting down."**   This email also confirms Tynax's knowledge that Lunera was in the process of transferring substantially all of its assets, including the Patents.   Mr. Smith forwarded his email to Signify.

182.   Mr. Smith's December 20 email also put Tynax on notice of Lunera's insolvency and of concerns regarding the potential for fraudulent conveyance claims.   For instance, Mr. Smith asked Bruggeman and Mr. Tighe for confirmation that Lunera is "not insolvent," and explained that "an asset sale by an insolvent company can sometimes be unraveled … so we would just like some assurances that the sale will be final and cannot be unraveled."   Upon information and belief, either Bruggeman and/or Tighe confirmed that Lunera was indeed insolvent or falsely represented that it was not.

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

183.    Accordingly, Tynax (through Mr. Smith) knew, or through due diligence and investigation should have known, that Lunera was insolvent, especially given Tynax's knowledge that Lunera was shutting down and winding up, and its policy of not purchasing from insolvent companies.  Further, Signify replied to Mr. Smith's forwarding of his December 20 email.  Signify acknowledged **"the issues we are seeing and the risks regarding possible future action from creditors"** and wanted to use that as leverage to drive down the price of the Patents.

184.    Additionally, Tynax was surprised to learn that the liens on the Patents had been released.  On January 25, 2019, Mr. Smith emailed Bruggeman and Tighe stating, "[t]o be honest, I had a chat with one of my colleagues and we couldn't see why the banks would release the liens, so it's great news that you got this through.  We thought the banks might want to take the patents."  Tynax was also on notice of the amended payment instructions that diverted nearly all of the sales proceeds to Oro and DLA while Lunera was insolvent.

185.    All of the foregoing facts and circumstances put Tynax and Signify on notice of the Director Defendants' fraudulent intent.  At a minimum, those facts and circumstances should have caused Tynax and Signify to diligently investigate further into the purpose of the transfer.  Instead of investigating, Tynax and Signify proceeded with the transaction and were complicit in, and aided and abetted, the fraudulent transfers of Lunera's Patents for the purpose of placing those assets beyond Super Lighting's reach to delay, hinder, and impede its ability to enforce its arbitration award and Judgment.

**K.    Super Lighting Obtains a Federal Court Judgment Against Lunera and Promptly Commences Post-Judgment Discovery.**

186.    Lunera defaulted and failed to appear at the noticed March 14, 2019 Arbitration hearing and trial.  Accordingly, on May 14, 2019, the arbitrator issued a final award in favor of Super Lighting on its claims in the total amount of $14,452,997, including $383,264 in attorneys' fees.  Lunera was ordered to pay the final award within 30 days.  On June 12, 2019, the United States District Court for the Northern District of California granted Super Lighting's Petition to Confirm Arbitration Award and entered a judgment against Lunera in the amount of $14,452,997 (the "Judgment").

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

187.   Following the Judgment, Super Lighting promptly initiated comprehensive post-judgment discovery that produced thousands of pages of relevant documents and included several depositions.   Through post-judgment discovery, Super Lighting discovered the above-described fraud that was otherwise concealed from Super Lighting.   The Judgment remains wholly unpaid.

**L.     Lunera's Statutory Dissolution and the Inapplicability of 8 Del. C. § 281(c).**

188.   On July 30, 2019, Lunera officially dissolved.   Super Lighting was never informed of Lunera's dissolution.   Indeed, it was not until October 4, 2019, through the filing of a motion to withdraw by DLA in the underlying breach of contract litigation and the Arbitration, that Super Lighting learned of Lunera's dissolution.

189.   At no time did the Director Defendants or any other governing person of Lunera attempt to comply with Sections 280 and 281 of Title 8 of the Delaware Corporation Code (8 Del. C. §§ 280, 281) with respect to Super Lighting.   In fact, at no time after Lunera's dissolution did Super Lighting ever receive statutory notice of the dissolution pursuant to Section 280(a)(1), including any notice requiring all persons having a claim against Lunera (other than the breach of contract claim still pending against Lunera) to present their claims against Lunera in accordance with the requirements set forth in Section 280(a)(1)(a-f).

190.   Nor has Lunera adopted any plan of distribution since its dissolution pursuant to Section 281(b) in which Lunera shall pay or make reasonable provision to pay all claims and obligations known to Lunera or that are likely to arise based on facts known to Lunera.

191.   Accordingly, the Director Defendants are not entitled to the protections of Section 281(c), 8 Del. C. 281(c), of the Delaware Corporation Code.

**VI.     SUPER LIGHTING'S STANDING TO ASSERT DERIVATIVE CLAIMS**

192.   Under Delaware law[4], creditors of an insolvent corporation have standing to maintain derivative claims against directors on behalf of the corporation for breaches of fiduciary duties. Once a corporation is insolvent, the creditors replace the stockholders as the equitable owners of the

---

[4] Delaware law applies to the derivative claims under California's choice of law principles and the internal affairs doctrine.   *See* Cal. Corp. Code § 2116;   *see also In re ECS Refining, Inc.*, 625 B.R. 425, 440-443 (Bankr. E.D. Cal.  2020).

corporation's assets and the residual beneficiaries of any increases in value.  The directors continue to owe fiduciary duties *to the corporation* to maximize its value for the benefit of all of its residual claimants, a category that now includes its creditors.  *Quadrant Structured Products Co., Ltd. v. Vertin*, 115 A.3d 535, 545-551 (Del. Ch. 2015).

193.    Thus, the fiduciary duty tool is transferred to the creditors when the firm is insolvent in aid of the creditor's contract rights because the creditors have the right to benefit from the insolvent firm's operations until they are fully repaid.  As the constituency with a claim on the corporation's assets during insolvency, it is the creditors who have an interest in ensuring that the directors comply with their traditional fiduciary duties of good faith, loyalty, and care.   *Id*. at 551-52.  Individual creditors of an insolvent corporation therefore have the same incentive to pursue derivative claims on behalf of the corporation that shareholders have when the corporation is solvent.

194.    Consequently, under Delaware law, "the corporation's insolvency makes the *creditors* the principal constituency *injured* by any fiduciary breaches that diminish the firm's value."  Any breach of those duties *injures creditors* as a class by, for example, reducing the assets of the firm available to satisfy creditors.  Thus, in the creditor-derivative context, any recovery benefits the corporation as a whole but *inures to creditors*.  *Id*. at 551-552, 554.

195.    Super Lighting has standing to assert the derivative claims alleged herein because (a) at all relevant times Super Lighting was and still is a creditor of Lunera with a valid claim, and (b) Lunera is, and at all relevant times was, insolvent.

196.    The California Uniform Voidable Transactions Act, Cal. Civ. Code § 3439.01 ("CUVTA") and the Delaware Uniform Fraudulent Transfer Act, 6 Del. C. § 1301 ("DUFTA") both define "creditor" as a person that "has a claim."  Both statutes in turn broadly define "claim" to mean "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured." *Id*.  Both statutes define "debtor" as someone who is liable on a claim.  *Id.*

197.    As described in detail in Section V.A-C *supra*, Super Lighting's status as a creditor of Lunera was firmly established prior to the fraudulent transfers. In late 2017 and into February 2018,

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

Lunera admittedly was delinquent on more than $11 million of unpaid invoices for goods delivered, thereby giving Super Lighting an unconditional and continuing "right to payment" from Lunera because that debt was never paid.  Super Lighting is also a judgment creditor with respect to the Judgment for which Lunera remains liable.

198.    Additionally, a plaintiff can plead insolvency of a Delaware corporation under either the "cash flow" test or the "balance sheet" test.  *Quadrant Structured Prods. Co. v. Vertin*, 102 A.3d 155, 176-77 (Del. Ch. 2014).  Under the cash flow test, a corporation is considered insolvent when it is generally unable to pay its debts as they come due.  Under the balance sheet test, an entity is insolvent if the sum of its liabilities is greater than the sum of the fair market value of its assets.  *Id*.  The CUVTA and DUFTA use these same tests to define "insolvency" of a debtor.  *Id*. at Cal. Civ. Code § 3439.02 and 6 Del. C. § 1302.

199.    As described in Section V.D *supra*, Lunera is, and at all relevant times was, insolvent.  The Director Defendants knew as early as December 31, 2017 that Lunera was insolvent and that its ability to continue as a going concern was in jeopardy.  The documents described above show that from at least December 31, 2017 and continuing through Lunera's dissolution in July 2019, Lunera was at all times insolvent because the sum of its debts remained significantly greater than the sum of the fair market value of its assets *and* it was not paying its debts as they became due, especially with respect to the Super Lighting debt.

200.    Also as described above, the Director Defendants were advised of their fiduciary duties by DLA during the September 17, 2018 board meeting, including being advised of their expanded fiduciary duties "to the corporate enterprise" due to Lunera's insolvency and the impact and application of those duties with respect to creditors.

201.    Super Lighting's derivative claims are ripe for judicial consideration because they allege that Lunera has already suffered an injury in fact as a result of the Director Defendants' breaches of fiduciary duty, including the diminishing of Lunera's value and eliminating all remaining assets, leaving Lunera without the ability to satisfy its debts to its creditors.

202.    This derivative action is not a collusive one to confer jurisdiction that this Court would otherwise lack.

203.     Accordingly, Super Lighting has satisfied its burden to plead standing to assert derivative claims as a creditor.

## VII.   DEMAND FUTILITY ALLEGATIONS

204.     As a result of Lunera's insolvency, Super Lighting, as a creditor, has the right to assert claims for breach of fiduciary duty derivatively on behalf of Lunera.

205.     Super Lighting has not made a demand upon the Director Defendants (each of who made up the entire Lunera board at all relevant times) because such demand would be futile and is excused.  Lunera no longer has any directors upon which to make a demand.  Lunera dissolved on July 30, 2019, and all of the Director Defendants contemporaneously resigned.

206.     At the time Super Lighting filed the underlying breach of contract litigation on August 20, 2018, Super Lighting's current claims for fraudulent transfers and breach of fiduciary duty had not yet accrued.  It was not until after post-judgment discovery commenced—which was after the dissolution of Lunera and the resignation of the Director Defendants—that Super Lighting discovered relevant facts sufficient to put it on notice of the claims asserted in this Complaint.

207.     At the time of discovery of facts sufficient to assert the derivative claims asserted in this Complaint (including the fraudulent transfers), Lunera was already dissolved and it had no management or directors upon which a demand could be made.

208.     Additionally, the Director Defendants face a substantial likelihood of liability on the claims alleged.  They are all directly interested and implicated in each of the unlawful and fraudulent transactions and conduct alleged to have been willfully and deliberately taken at the expense of Lunera and Super Lighting (as a creditor) while Lunera was insolvent.

209.     All of the Director Defendants are alleged to have breached their fiduciary duties of good faith, care and loyalty to Lunera in connection with the Elite transaction and in willfully causing Lunera to make the fraudulent transfers while insolvent.  Accordingly, those same Director Defendants (all of who made up the entire Lunera board at the time of the Elite transaction and the fraudulent transfers) would have been incapable of exercising independent business judgment in evaluating a demand to prosecute the claims Super Lighting is asserting derivatively against those very same directors.  Indeed, even a demand made solely in connection with the Elite transaction in

November 2018 would have been futile because there were no other directors, let alone any disinterested directors, upon whom a demand could have been made. Moreover, as alleged above, the fraudulent transfers and other unlawful conduct alleged herein were not the product of a valid exercise of business judgment by the Director Defendants.

210.    Since there is no longer any Lunera board, there is no risk of usurping the board's authority and prerogative to decide how to handle a corporate claim. Accordingly, pre-suit demand upon the Director Defendants to assert the stated claims for breach of fiduciary duty would be futile and is excused.

## VIII.  CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**ACTUAL AND CONSTRUCTIVE FRAUDULENT TRANSFER OF INVENTORY**

**California Uniform Voidable Transactions Act, Cal. Civ. Code §§ 3439.04(a)(1); 3439.05(a); *and* Delaware Uniform Fraudulent Transfer Act, 6 Del. C. §§ 1304(a)(1); 1305(a)**

**(Against the Director Defendants, OEO, Advanced Trading, Einarsen, and Butz)**

211.    Super Lighting incorporates Paragraphs 1-191 by reference, and further alleges as follows.

212.    As described in Section V.I *supra*, the Director Defendants, OEO, Advanced Trading, and Einarsen and Butz (as the alter egos of Advanced Trading and vice versa) approved, caused, facilitated, aided and abetted, caused, conspired to cause, and effectuated Lunera's actual and constructive fraudulent transfer of its inventory.

213.    As described above, at all relevant times, Super Lighting was and still is a creditor of Lunera, a debtor that remains liable for Super Lighting's Judgment.

214.    As described above, the fraudulent transfers alleged herein were "transfers" of "assets" within the meaning of Cal. Civ. Code § 3439.01 and 6 Del. C. § 1301.

215.    As described above, Lunera was insolvent at the time of each transfer of inventory.

216.    As described above, the consideration for each transfer of inventory was grossly negligent and for less than reasonably equivalent value.

217.    By taking the actions described above, the Director Defendants, OEO, Advanced

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

Trading, and Einarsen and Butz (as the alter egos of Advanced Trading and vice versa) made, and caused Lunera to make, the fraudulent transfers with the actual intent to hinder, delay, impede, and/or defraud Super Lighting and its ability to enforce its arbitration award and Judgment.

218.    In addition to the facts described in Section V.F-I *supra*, the actual fraudulent intent and bad faith of the Director Defendants, OEO, Advanced Trading, and Einarsen and Butz (as the alter egos of Advanced Trading and vice versa) is further established by facts substantiating the numerous statutory "badges of fraud" that are also alleged and described in detail above.   These include:

    a.  **Lunera was insolvent at the time of each transfer of inventory**. Cal. Civ. Code § 3439.04(b)(9); 6 Del. C. § 1304(b)(9). As described above, the Director Defendants knew Lunera was insolvent at the time of each transfer.  OEO, Advanced Trading, Einarsen, and Butz knew, or through due diligence and investigation should have known, that Lunera was insolvent at the time of each transfer.

    b.  **The transfers of inventory were concealed from Super Lighting**. Cal. Civ. Code § 3439.04(b)(3); 6 Del. C. § 1304(b)(3). As described above, the Director Defendants, OEO, Advanced Trading, Einarsen and Butz used Advanced Trading as a sham company to avoid detection of the transfers and avoid the pending Attachment Motion and Arbitration and for the purpose of putting the assets beyond Super Lighting's reach.

    c.  **At the time of each transfer of inventory, Lunera was already five months into litigation filed against it by Super Lighting.** Cal. Civ. Code § 3439.04(b)(4); 6 Del. C. § 1304(b)(4). As described above, the Director Defendants, OEO, Advanced Trading, Einarsen, and Butz knew that Lunera was in litigation with Super Lighting and that Lunera owed Super Lighting $13 million, and further knew that the lawsuit was leading to an award and judgment in Super Lighting's favor.

    d.  **The transfer of inventory was of substantially all of Lunera's assets.**  Cal. Civ. Code § 3439.04(b)(5); 6 Del. C. § 1304(b)(5).  As described above, the Director Defendants, OEO,  Advanced Trading, Einarsen, and Butz knew that the transfer of inventory was of substantially all of Lunera's assets.

    e.  **Lunera concealed assets.**  Cal. Civ. Code § 3439.04(b)(7); 6 Del. C. § 1304(b)(7). As described above, the Director Defendants knowingly and willfully failed to identify more than 235,000 units of inventory to the emergency Arbitrator in response to his order granting the Attachment Motion.

    f.  **The consideration received in exchange for the transfer of inventory was grossly negligent and was not reasonably equivalent to the value of the inventory transferred.**  Cal. Civ. Code § 3439.04(b)(7); 6 Del. C. § 1304(b)(7).  As described above, the Director Defendants, OEO, Advanced Trading, Einarsen, and Butz knew that the consideration received for the transfer of inventory was grossly negligent and

47

was not for reasonably equivalent value.

g.  **The Defendants absconded**.  Cal. Civ. Code § 3439.04(b)(6); 6 Del. C. § 1304(b)(6). As described above, the Director Defendants, OEO, Advanced Trading, Einarsen and Butz tried to avoid detection of the transfers and conducted a fire sale to liquidate the inventory and avoid the pending Attachment Motion and Arbitration and for the purpose of putting the assets beyond Super Lighting's reach.

219.  As a result of the actual and constructive fraudulent transfers of Lunera's inventory by the Director Defendants, OEO, Advanced Trading, and Einarsen and Butz (as the alter egos of Advanced Trading and vice versa) as described above in Section V.F-I, Super Lighting was injured because the transfers put the inventory—assets that all of the foregoing Defendants knew Super Lighting otherwise would be able to subject to the payment of its arbitration award and Judgment—beyond Super Lighting's reach and delayed, hindered, and impeded its ability to enforce its arbitration award and Judgment.  The transfers eliminated substantially all of Lunera's remaining assets, leaving Lunera with liability for the Judgment but without any assets or the means to satisfy any part of that obligation to Super Lighting.

220.  The Director Defendants, OEO, Advanced Trading, and Einarsen and Butz (as the alter egos of Advanced Trading and vice versa), are liable, jointly and severally, to Super Lighting for the value of the assets transferred or the amount necessary to satisfy Super Lighting's Judgment as the first transferee who did not take for value and in good faith; the subsequent transferee (or immediate transferee of the first transferee) who did not take for value and in good faith; and/or the persons for whose benefit the transfers were made, including the persons who forced or caused Lunera to effectuate the transfers.  Cal. Civ. Code § 3439.08; 6 Del. C. § 1308.

221.  Einarsen and Butz, as the alter egos of Advanced Trading and vice versa, are personally liable for the fraudulent transfers because of their abusive use of the corporate form solely as a vehicle to effectuate and conceal the fraudulent transfer of Lunera's inventory.

222.  In taking the actions described above to cause the fraudulent transfer of Lunera's inventory, the Director Defendants, OEO, Advanced Trading, and Einarsen and Butz (as the alter egos of Advanced Trading and vice versa) acted in bad faith, willfully, maliciously, and in reckless disregard of and with conscience indifference to Super Lighting's interests and rights as a creditor of

Lunera, justifying the imposition of an award of punitive damages.

223. Super Lighting is entitled to equitable relief and damages, including punitive damages and attorneys' fees, in an amount to be determined at trial, including without limitation:

    a. The value of the inventory transferred or the amount necessary to satisfy Super Lighting's Judgment;

    b. Avoidance of the transfers to the extent necessary to satisfy Super Lighting's Judgment;

    c. An attachment against the transferred assets;

    d. An injunction against further transfer of the assets;

    e. Appointment of a receiver to take charge of the assets;

    f. A levy of execution against the assets or their proceeds; and

    g. Any other relief that the circumstances may require.

## SECOND CAUSE OF ACTION

### ACTUAL AND CONSTRUCTIVE FRAUDULENT TRANSFER OF PATENTS

**California Uniform Voidable Transactions Act, Cal. Civ. Code §§ 3439.04(a)(1); 3439.05(a); *and* Delaware Uniform Fraudulent Transfer Act, 6 Del. C. §§ 1304(a)(1); 1305(a)**

### (Against the Director Defendants, Tynax, and Signify)

224. Super Lighting incorporates Paragraphs 1-191 by reference, and further alleges as follows.

225. As described in Section V.J. *supra*, the Director Defendants, Tynax, and Signify approved, caused, facilitated, aided and abetted, caused, conspired to cause, and effectuated Lunera's actual and constructive fraudulent transfer of its Patents.

226. As described above, at all relevant times, Super Lighting was and still is a creditor of Lunera, a debtor that remains liable for Super Lighting's Judgment.

227. As described above, the fraudulent transfers alleged herein were "transfers" of "assets" within the meaning of Cal. Civ. Code § 3439.01 and 6 Del. C. § 1301.

228. As described above, Lunera was insolvent at the time of the transfer of Patents.

229. As described above, the consideration for the transfer of Patents was grossly

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

1   negligent and for less than reasonably equivalent value.

2       230.   By taking the actions described above, the Director Defendants, Tynax, and Signify

3   made, and caused Lunera to make, the transfers with the actual intent to hinder, delay, impede,

4   and/or defraud Super Lighting and its ability to enforce its arbitration award and Judgment.

5       231.   In addition to the facts described in Section V.F-J *supra*, the actual fraudulent intent

6   and bad faith of the Director Defendants, Tynax, and Signify is further established by facts

7   substantiating the numerous statutory "badges of fraud" that are also alleged and described in detail

8   above.  These include:

    a.   **Lunera was insolvent at the time of transfer**. Cal. Civ. Code § 3439.04(b)(9); 6 Del. C. § 1304(b)(9). The Director Defendants knew Lunera was insolvent at the time of the transfer.  Tynax and Signify knew, or through due diligence and investigation should have known, that Lunera was insolvent at the time of the transfer.

    b.   **The transfer of Patents was concealed from Super Lighting**. Cal. Civ. Code § 3439.04(b)(3); 6 Del. C. § 1304(b)(3). As described above, the Director Defendants, Tynax, and Signify concealed the transfers of the Patents from Super Lighting.

    c.   **At the time of transfer of the Patents, Lunera was already five months into litigation filed against it by Super Lighting.**  Cal. Civ. Code § 3439.04(b)(4); 6 Del. C. § 1304(b)(4). As described above, the Director Defendants knew that Lunera was in litigation with Super Lighting and that Lunera owed Super Lighting $13 million, and that the lawsuit was clearly leading to an award and judgment in Super Lighting's favor. Tynax and Signify knew, or through due diligence and investigation should have known, of those same facts.

    d.   **The transfer of Patents was of substantially all of Lunera's assets.**  Cal. Civ. Code § 3439.04(b)(5);  6 Del. C. § 1304(b)(5).   As described above, the Director Defendants, Tynax, and Signify knew that the transfer of Patents was of substantially all of Lunera's assets.

    e.   **The consideration received in exchange for the transfer of Patents was grossly negligent and was not reasonably equivalent to the value of the Patents transferred.**  Cal. Civ. Code § 3439.04(b)(7); 6 Del. C. § 1304(b)(7).  As described above, the Director Defendants, Tynax, and Signify knew that the consideration for the transfer of Patents was grossly negligent and was not for reasonably equivalent value.

    f.   **The Defendants absconded.** Cal. Civ. Code § 3439.04(b)(6); 6 Del. C. § 1304(b)(6). As described above, the Director Defendants, Tynax, and Signify conducted a fire sale to liquidate the Patents as quickly as possible to avoid potential attachment and for the purpose of putting the assets beyond Super Lighting's reach.

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

50

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

232.    As a result of the actual and constructive fraudulent transfers of Lunera's Patents by the Director Defendants, Tynax, and Signify as described above in Section V.F-H, and J, Super Lighting was injured because the transfers put the Patents—assets that these Defendants knew Super Lighting otherwise would be able to subject to the payment of its Judgment—beyond Super Lighting's reach and delayed, hindered, and impeded its ability to enforce its arbitration award and Judgment.  The transfers eliminated substantially all of Lunera's remaining assets, leaving Lunera with liability for the Judgment but without any assets or the means to satisfy any part of that obligation to Super Lighting.

233.    The Director Defendants, Tynax, and Signify are liable, jointly and severally, to Super Lighting for the value of the Patents transferred or the amount necessary to satisfy Super Lighting's Judgment as the first transferee who did not take for value and in good faith; the subsequent transferee (or immediate transferee of the first transferee) who did not take for value and in good faith; and/or the persons for whose benefit the transfers were made, including the persons who forced or caused Lunera to effectuate the transfers.  Cal. Civ. Code § 3439.08; 6 Del. C. § 1308.

234.    In taking the actions described above to cause the fraudulent transfer of Lunera's Patents, the Director Defendants, Tynax, and Signify acted in bad faith, willfully, maliciously, and in reckless disregard of and with conscience indifference to Super Lighting's interests and rights as a creditor of Lunera, justifying the imposition of an award of punitive damages.

235.    Super Lighting is entitled to equitable relief and damages, including punitive damages and attorneys' fees, in an amount to be determined at trial, including without limitation:

    a.  The value of the Patents transferred or the amount necessary to satisfy Super Lighting's Judgment;

    b.  Avoidance of the transfers to the extent necessary to satisfy Super Lighting's Judgment;

    c.  An attachment against the transferred assets;

    d.  An injunction against further transfer of the assets;

    e.  Appointment of a receiver to take charge of the assets;

    f.  A levy of execution against the assets or their proceeds; and

g.   Any other relief that the circumstances may require.

### THIRD CAUSE OF ACTION

### BREACH OF FIDUCIARY DUTIES

### (Against the Director Defendants)

236.    Super Lighting incorporates Paragraphs 1-191 by reference, and further alleges as follows.

237.    Super Lighting asserts this breach of fiduciary duty claim derivatively as a creditor on behalf of and for the benefit of Lunera.  Under Section 278 of the Delaware General Corporation Law, Lunera continues for a term of three years from such dissolution for the purpose of prosecuting and defending suits by or against it.  8 Del. C. § 278.

238.    Delaware law imposes fiduciary duties on corporate directors.  As a rule, that duty requires directors to exercise due care and loyalty toward the corporation and to undertake their actions in good faith.  These duties include the duty to maximize the value of the corporation for the benefit of all of its residual claimants.

239.    Directors of an insolvent firm continue to owe these fiduciary duties to the corporation for the benefit of all of its residual claimants—a category that now includes creditors as the principal residual claimants and ultimate beneficial owners of the corporate assets. When the corporation is insolvent, its creditors take the place of the shareholders as the residual beneficiaries of any increase in corporate value.

240.    Consequently, the creditors of an insolvent corporation have standing to maintain derivative claims against directors on behalf of the corporation for breaches of fiduciary duties.  As a result of the corporation's insolvency, the creditors are the principal constituency injured by any fiduciary breaches that diminish the firm's value and reduce the assets available to satisfy creditors. Individual creditors of an insolvent corporation therefore have the same incentive to pursue derivative claims on behalf of the corporation that shareholders have when the corporation is solvent.  Any recovery by the corporation inures to creditors and stockholders according to their priority.

241.   Directors must exercise due care, both in decision making by acting on an informed basis and in other aspects of their responsibilities (e.g., whether the directors informed themselves of all material information reasonably available to them before making a business decision).  As a rule, the directors must exercise that amount of care that ordinary careful and prudent persons would use in similar circumstances.

242.   As applied to decision-making, Delaware courts apply a gross negligence standard, which means reckless indifference to or a deliberate disregard of the whole body of stockholders [here, creditors] or actions that are without the bounds of reason.  Delaware also requires the exercise of due care to be undertaken in good faith. Lack of good faith can be inferred through a director's intentional misconduct or where a director intentionally acts with a purpose other than advancing the best interests of all residual claimants, a category that includes creditors upon the corporation's insolvency.

243.   Additionally, for purposes of pleading, a bad faith breach of the duty of care falls within the lack of good faith exception to Section 102(b)(7) of the Delaware Corporation Code.[5]

244.   Directors must also act with loyalty to the corporation in their management of its affairs, which arises from the premise that they are duty-bound to the true owners of the corporation, the stockholders (here, the creditors who replace the stockholders as the residual beneficiaries of any increase in value upon insolvency).

245.   The duty of loyalty requires directors to act in good faith.  A plaintiff can call into question a director's loyalty by showing the director engaged in self-interest or failed to pursue the best interests of the corporation and its residual claimants and therefore failed to act in good faith.  A failure to act in good faith can be shown where the director intentionally acts with a purpose other than that of advancing the best interests of the corporation and its residual claimants.

---

[5] Delaware law does not allow a corporation's certificate of incorporation to eliminate or limit the personal liability of directors for breaches of the duty of loyalty or for acts or omissions *not in good faith or which involve intentional misconduct.*  8 Del. C. § 102(b)(7).  Lunera's Certificate of Incorporation violates Section 102(b)(7) because it impermissibly purports to eliminate a director's liability for *any* breach of fiduciary duty.  ("a director of the corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for *breach of fiduciary duty* as a director.") (*see* ECF 52-2, at 25).

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

246.    As described above in Section V.D, Lunera is, and at all relevant times was, insolvent.

247.    As described above in Section V.A-C, and K, Super Lighting was at all relevant times, and still is, a creditor of Lunera.

248.    Accordingly, as described above in Section VI, Super Lighting has standing to assert claims for breach of fiduciary duty derivatively on behalf of Lunera.

249.    The Director Defendants owed the fiduciary duties of care, loyalty, and good faith to Lunera for the benefit of its residual claimants, including its creditors as the equitable owner of Lunera's assets due to Lunera's insolvency at all relevant times.  The Director Defendants knew that Super Lighting was Lunera's largest residual claimant.

250.    As described above, the Director Defendants were advised of their fiduciary duties by DLA during the September 17, 2018 board meeting, including being advised by counsel of their expanded fiduciary duties to Lunera as a result of its insolvency, as well as the impact and application of those duties during insolvency (e.g., being advised that fraudulent transfers are a breach of fiduciary duty).

251.    By taking the actions described above in connection with the Elite transaction and in causing Lunera to make the fraudulent transfers of Lunera's inventory and Patents, as described in Section V *supra*, each of the Director Defendants disregarded the advice they received in the September 2018 board meeting, engaged in intentional misconduct, and breached their fiduciary duties of good faith, care, and loyalty to Lunera.

252.    For example, by taking the actions described above in connection with the Elite transaction and in causing Lunera to make the fraudulent transfers of Lunera's inventory and Patents, as described in Section V *supra*, each of the Director Defendants acted in bad faith, in self-interest, failed to make informed decisions; acted intentionally for purposes other than advancing the best interests of Lunera and all of its residual claimants, which included creditors such as Super Lighting, and failed to preserve maximum value of Lunera for the benefit of all its residual claimants, including Super Lighting.

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

253.    By taking the actions described above in connection with the Elite transaction and in causing Lunera to make the fraudulent transfers of Lunera's inventory and Patents, as described in Section V *supra*, each of the Director Defendants engaged in grossly negligent conduct and acted with reckless indifference to—and in deliberate disregard of—Lunera's residual claimants, including Super Lighting as Lunera's largest and principal residual claimant.

254.    The foregoing fraudulent transfers were so self-interested and one-sided that no ordinary prudent person could conclude that they were made in good faith, on an informed basis, that Lunera received adequate consideration for the transfers, that the transfers were beneficial to Lunera and its residual claimants, including Super Lighting, or that the transfers preserved maximum value for distribution to Lunera's residual claimants.

255.    After their bad faith conduct in connection with the Elite transaction, the Director Defendants acted in a way that made Lunera's situation more dire and retaliated against Super Lighting by willfully placing the inventory and Patents—assets that the Director Defendants knew Super Lighting otherwise would be able to subject to its arbitration award and Judgment—beyond Super Lighting's reach for the intended purpose of delaying, hindering, and impeding its ability to enforce its arbitration award.

256.    Lunera's insolvency and Super Lighting's status as a creditor made Super Lighting a principal constituency injured by the Director Defendants' above-described fiduciary breaches that diminished Lunera's value and eliminated all of its remaining assets, leaving Lunera with liability for the Judgment but without any assets or the means to satisfy any part of that obligation to Super Lighting.

257.    As a result of the bad faith, self-interested, and intentional actions described above in breach of their fiduciary duties to Lunera, the Director Defendants lose the presumptions of the business judgment rule.

258.    Accordingly, the Director Defendants are jointly and severally liable to Lunera for their breaches of fiduciary duty described above in an amount to be determined at trial.

259.    By taking the actions described above that constitute breaches of fiduciary duty to Lunera, each of the Director Defendants acted in bad faith, willfully, maliciously, and engaged in

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

intentional misconduct for purposes other than advancing the best interests of Lunera and all of its residual claimants, which included creditors, justifying the imposition of an award of punitive damages.

260.    Additionally, Super Lighting's derivative claims for breach of fiduciary duties are non-exculpatory claims involving intentional misconduct, the duty of loyalty and bad faith breach of the duty of care, all of which fall within the exception to Section 102(b)(7) of the Delaware Corporation Code, including the lack of good faith and intentional misconduct exceptions.

### FOURTH CAUSE OF ACTION

### ALTER EGO/CORPORATE VEIL PIERCING

### (Against Advanced Trading, Einarsen, and Butz)

261.    Super Lighting incorporates Paragraphs 1-191 by reference, and further alleges as follows.

262.    The alter-ego doctrine arises when a plaintiff claims that an opposing party is using the corporate form unjustly and in derogation of the plaintiff's interests.  In certain situations, like those present here, the corporate veil can be pierced as a tool of equity to disregard the corporate entity and impose derivative liability on the corporation's individual principals and their personal assets to avoid injustice.

263.    There is a compelling unity of interest and identical ownership between and among Advanced Trading, OEO, Einarsen, and Butz such that the separate personalities of Advanced Trading and its two controlling principals do not exist.  Additionally, an inequitable and unjust result will follow if the fraudulent acts are treated as those of Advanced Trading alone.

264.    For example, as described above, Lunera's inventory was fraudulently transferred to OEO through invoices issued by Lunera to Advanced Trading on **January 10, 2019 and January 18, 2019**.  Einarsen and Butz are listed as OEO's sole principal Managers in OEO's filings with the Illinois and Nevada Secretary of State's Offices.  Those same filings also list OEO's principal office address, as well as the business address provided for Einarsen and Butz, as 143 East Main Street, Lake Zurich, Illinois 60047.

265.     According to the Delaware Secretary of State's Office, Advanced Trading was formed and incorporated on **December 27, 2018**.  According to the Illinois Secretary of State's Office, Advanced Trading registered with the Illinois Secretary of State on **January 17, 2019**.  Those same records currently list Einarsen and Butz as the sole principal Managers of Advanced Trading.  Advanced Trading's principal office address, as well as the business address of its two principals, Einarsen and Butz, is the same Lake Zurich, Illinois address as OEO.  OEO and Advanced Trading also share the same registered agent for service of process in Illinois.

266.     OEO was co-founded, and at all relevant times was and is owned and controlled, by Einarsen (its CEO) and Butz (its President). As CEO and President of OEO and its sole managing principals, Einarsen and Butz dominate and control OEO's day to day operations.

267.     Advanced Trading was at all relevant times formed, owned, operated, controlled, and dominated by Einarsen and Butz, was and is the alter ego of Einarsen and Butz, and vice versa, was and is united in interest with Einarsen and Butz, was and is subject to Einarsen's and Butz's effective direction and control, and was and is operated by Einarsen and Butz as their alter ego.  Advanced Trading was formed and simply functioned as a conduit for the business of OEO.

268.     Einarsen and Butz, conspired and intentionally formed Advanced Trading as a mere shell company and conduit to effectuate and conceal the fraudulent transfer of Lunera's inventory to OEO for the intended purpose of placing those assets beyond Super Lighting's reach.

269.     Advanced Trading was organized and incorporated in Delaware just *two weeks prior* to the transfer of Lunera's inventory, and it was registered in Illinois *contemporaneously with* the inventory transfers.  Advanced Trading does not appear to have had any other ongoing business operations or activities whatsoever since the transfers were effectuated.  Indeed, there is no mention or reference to Advanced Trading anywhere on OEO's website and social media pages or on Einarsen's and Butz's personal LinkedIn pages.  Advanced Trading does not, upon information and belief, have any employees, corporate assets, or capitalization.

270.     Nor has Advanced Trading observed corporate formalities or maintained or filed corporate records.  In fact, Advanced Trading has not made a single filing with the Delaware Secretary of State's Office since December 27, 2018—the date of its incorporation and its last

**Locke Lord LLP**
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

FIRST AMENDED VERIFIED COMPLAINT

provided "status" date.

271.    Other than being formed for no other purpose than as a one-time vehicle for fraudulently transferring Lunera's inventory to OEO, Advanced Trading exists as little more than a legal fiction.  Indeed, Advanced Trading was formed and used solely as a mere conduit for the affairs and benefit of another entity owned and controlled by Einarsen and Butz—OEO.  In doing so, Einarsen and Butz used Advanced Trading to fraudulently procure and divert Lunera assets for and to OEO, to the detriment of Super Lighting's rights and interests as a judgment creditor.

272.    As alleged above, Einarsen's and Butz's motive in forming and using Advanced Trading as their alter ego and as a façade for concealing OEO's fraudulent acquisition of Lunera's inventory is evident—they needed to create a fiction to illegitimately avoid taking on personal liability for their fraudulent transfers.  The reason is that, prior to the transfers of Lunera's inventory at issue, OEO, Einarsen, and Butz knew of the fraudulent nature of the transfers and had a **"fear of Super Lighting claiming fraudulent conveyance."**

273.    Accordingly, the fraud and injustice is evident in Einarsen's and Butz's *use* of the corporate form solely as an instrumentality to effectuate and conceal the fraudulent transfer of Lunera's inventory.  As a result of the willful, bad faith actions described above, Einarsen and Butz abused the corporate form and lose the privilege and protection of Advanced Trading's corporate veil.

274.    Accordingly, Einarsen and Butz are individually and personally liable for the fraudulent acts of Advanced Trading in an amount to be determined at trial.

275.    By taking the actions described above that constituted fraud, Einarsen and Butz acted in bad faith, willfully, maliciously, and in reckless disregard of—and with conscience indifference to—the corporate privilege and Super Lighting's interests and rights as a creditor of Lunera, justifying the imposition of an award of punitive damages.

///

///

///

///

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA  90071

1

**CLAIM FOR RELIEF**

2          WHEREFORE, Super Lighting prays for judgment in its favor, and derivatively on behalf of

3   and for the benefit of Lunera, against all Defendants, jointly and severally, as follows:

4          a.   In Super Lighting's derivative capacity on behalf of Lunera, compensatory damages

5               in favor of Lunera on the breach of fiduciary duty claims in an amount to be

6               determined at trial;

7          b.   Compensatory damages in favor of Super Lighting on the fraudulent transfer claims

8               in an amount to be determined at trial;

9          c.   The value of the assets transferred or the amount necessary to satisfy Super

10              Lighting's Judgment;

11         d.   Punitive damages in an amount to be determined at trial;

12         e.   Avoidance of the transfers to the extent necessary to satisfy Super Lighting's

13              Judgment;

14         f.   An attachment against the transferred assets;

15         g.   An injunction against further transfer of the assets;

16         h.   Appointment of a receiver to take charge of the assets;

17         i.   A levy of execution against the assets or their proceeds;

18         j.   Costs of this action, including reasonable attorneys' fees incurred in connection with

19              the investigation into and the prosecution of this action, including costs and fees

20              incurred in post-judgment discovery, as provided under law;

21         k.   Prejudgment and post-judgment interest to the extent permitted by law; and

22         l.   Any further relief this Court deems just and proper.

23

24

25

26

27

28

**Locke Lord LLP**
**300 South Grand Avenue, Suite 2600**
**Los Angeles, CA 90071**

FIRST AMENDED VERIFIED COMPLAINT

Dated:  February 22, 2022

Respectfully submitted,

**LOCKE LORD LLP**

By: _/s/ Michael Wolak III_
    Michael Wolak III

Attorneys for Plaintiff Jiaxing Super Lighting Electric Appliance Co., Ltd.

### DEMAND FOR JURY TRIAL

Super Lighting hereby demands a trial by jury on all claims so triable.

Respectfully submitted,

**LOCKE LORD LLP**

By: _/s/ Michael Wolak III_
    Michael Wolak III

Attorneys for Plaintiff Jiaxing Super Lighting Electric Appliance Co., Ltd.

FIRST AMENDED VERIFIED COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Locke Lord LLP**
**300 South Grand Avenue, Suite 2600**
**Los Angeles, CA 90071**

## <u>VERIFICATION</u>

I have reviewed the allegations made in this First Amended Verified Complaint.  As to those allegations to which I have personal knowledge, I believe them to be true; as to those allegations of which I lack personal knowledge, I rely upon my counsel and its investigation and believe them to be true.  Having received and reviewed a copy of the First Amended Verified Complaint with counsel, I authorize its filing.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated: _18. Feb. 2022_
By: _Wellsey Yu_

FIRST AMENDED VERIFIED COMPLAINT